Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/21/2020 08:09 AM CDT

State of Nebraska, appellee, v.
Michael D. Benson, appellant.
___ N.W.2d ___

Filed May 29, 2020.    No. S-19-486.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Pleadings: Judgments: Appeal and Error.** A trial court's denial of a motion to sever will not be disturbed on appeal absent an abuse of discretion.

3. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

4. **Constitutional Law: Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination.

5. **Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), requires law enforcement to give a particular set of warnings to a person in custody before

interrogation, including that he or she has the right to remain silent, that any statement he or she makes may be used as evidence against him or her, and that he or she has the right to an attorney.

6. **Miranda Rights: Self-Incrimination: Evidence.** *Miranda* warnings are considered prerequisites to the admissibility of any statement made by a defendant during custodial interrogation.

7. **Miranda Rights.** *Miranda* warnings are required only when a suspect interrogated by the police is in custody.

8. ____. The ultimate inquiry for determining whether a person is in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is whether there is a formal arrest or restraint on freedom of movement of degree associated with a formal arrest.

9. ____. Custody under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is to be determined based on how a reasonable person in the suspect's situation would perceive his or her circumstances.

10. **Constitutional Law: Search and Seizure.** A seizure under the Fourth Amendment occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

11. **Miranda Rights.** In considering whether a suspect is in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), relevant considerations include, but are not limited to: the location of the interaction, who initiated the interaction, the duration of the interaction, the type and approach of questioning, the freedom of movement of the suspect, the duration of the interaction, and whether the suspect was placed under arrest at the termination of the interaction.

12. ____. The test for determining custody under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is an objective inquiry that does not depend on the subjective views harbored by either the interrogating officer or person being interrogated.

13. **Miranda Rights: Waiver: Words and Phrases.** To be a valid waiver of *Miranda* rights, a waiver must be knowingly and voluntarily made. A waiver is knowing if it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. A waiver is voluntary if it is the product of a free and deliberate choice rather than through intimidation, coercion, or deception.

14. **Miranda Rights: Waiver.** Whether a knowing and voluntary waiver of *Miranda* rights has been made is determined by looking to the totality of the circumstances.

15. **Miranda Rights: Waiver: Police Officers and Sheriffs.** While waiver must be knowingly made, law enforcement is not required to inform a suspect of all aspects of the investigation prior to the waiver of the suspect's *Miranda* rights.

16. **Miranda Rights: Police Officers and Sheriffs.** Law enforcement officers are not required to rewarn suspects from time to time of their *Miranda* rights. The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions.

17. **Search Warrants: Affidavits: Probable Cause: Appeal and Error.** In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test.

18. \_\_\_\_: \_\_\_\_: \_\_\_\_: \_\_\_\_. In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, the question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.

19. **Search Warrants: Probable Cause: Words and Phrases.** Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found.

20. **Search Warrants: Affidavits: Evidence: Appeal and Error.** In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued.

21. **Search Warrants: Time: Appeal and Error.** A search warrant and application's indicating incorrect dates of their drafting and signing is not per se fatal to the validity of a warrant.

22. **Search Warrants: Appeal and Error.** Misstatements within an application and warrant may still produce a valid warrant if the rest of the warrant and attached application cures any defect resulting from the scrivener's error when read together.

23. **Constitutional Law: Trial: Joinder.** There is no constitutional right to a separate trial.

24. **Trial: Joinder: Appeal and Error.** Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related to be joinable and (2) whether the joinder was prejudicial to the defendant.

25. **Trial: Joinder: Presumptions.** There is a strong presumption against severing properly joined counts.

26. **Trial: Joinder: Appeal and Error.** While Neb. Rev. Stat. § 29-2002
(Reissue 2016) presents two separate questions, there is no error under
either subsection (1) or (3) if joinder was not prejudicial, and a denial of
a motion to sever will be reversed only if clear prejudice and an abuse
of discretion are shown.

27. \_\_\_\_: \_\_\_\_: \_\_\_\_. An appellate court will find an abuse of discretion in
the denial of a motion to sever only where the denial caused the defend-
ant substantial prejudice amounting to a miscarriage of justice.

28. **Trial: Joinder.** Prejudice from joinder cannot be shown if evidence of
one charge would have been admissible in a separate trial of another
charge.

29. **Criminal Law: Witnesses.** Evidence of a defendant's attempted intimi-
dation or intimidation of a State's witness is relevant evidence of a
defendant's conscious guilt that a crime has been committed.

30. **Trial: Joinder: Juries: Evidence.** Joined charges do not usually result
in prejudice if the evidence is sufficiently simple and distinct for the
jury to easily separate evidence of the charges during deliberations.

Appeal from the District Court for Douglas County: Timothy
P. Burns, Judge. Affirmed.

Beau Finley, of Law Offices of Beau Finley, P.C., L.L.O.,
for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph
for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke,
Papik, and Freudenberg, JJ.

Funke, J.

Michael D. Benson was convicted of second degree murder,
use of a deadly weapon to commit a felony, possession of a
deadly weapon by a prohibited person, and two counts of tam-
pering with a witness. On appeal, Benson claims the district
court erred in failing to suppress statements he made to law
enforcement and cell phone data acquired pursuant to a search
warrant. Benson also claims the court committed reversible
error by declining to sever the two counts of tampering with
a witness from the other charges. Finally, Benson claims there

was insufficient evidence to support his convictions. For the reasons set forth herein, we affirm.

## BACKGROUND

This case concerns the fatal shooting of James Womack on September 18, 2017. Pursuant to this shooting, Benson was charged by amended information with second degree murder, use of a deadly weapon (firearm) to commit a felony, and possession of a deadly weapon by a prohibited person. The information was amended a second time to add two counts of tampering with a juror, witness, or informant regarding telephone calls made by Benson to witnesses Deja Jefferson and Erica Guitron on February 11 and 12, 2019.

## Motion to Suppress Statements

Prior to trial, Benson filed a motion to suppress and exclude any and all statements made by him to officers of the Omaha Police Department (Department) on September 20 and 23, 2017. On September 20, Benson had made statements to Officer Mark Negrete to report that his pickup had been stolen and that he believed it may have been used in the commission of the shooting. Benson argued that his statements on September 20 were inadmissible because he was subjected to custodial interrogation and never informed of his *Miranda* rights. Benson's statements on September 23 occurred in an interview with Det. Ryan Davis on the report that his pickup had been stolen. Davis, who had been investigating Womack's death, had evidence contradicting Benson's claim that his pickup had been stolen and had evidence that indicated Benson was a party with knowledge of the shooting. While Benson waived his rights following Davis' reading of a *Miranda* notice, Benson argued such waiver was not knowingly and freely given.

At a hearing on the motion, Negrete testified he was working patrol in his police uniform on September 20, 2017, and responded to a call concerning an individual wishing to report a stolen vehicle. Negrete first spoke to Sgt. Michael Ratliff of the homicide division, who gave him the assignment. Negrete

testified that it was not typical on a day-to-day basis to get assignments from the homicide unit. Ratliff told Negrete that he wanted him to take the report from the vehicle's owner, advised that the "vehicle may have been involved in a homicide," and mentioned Benson's name. Ratliff talked to Negrete about Negrete's body camera recording of his interaction with Benson. Ratliff's call with Negrete lasted about 3 minutes and occurred about 15 minutes prior to Negrete's receiving another call from dispatch about taking the report on the stolen vehicle.

When Negrete arrived at Benson's apartment, he met Benson in the parking lot. Negrete asked for Benson's name and proof of identification, but Benson did not have his identification, so he turned to get it from his apartment. Before Benson could go to his apartment, however, Negrete continued to ask him questions and get the information about the stolen vehicle while the parties were in the parking lot. Benson reported that at about 2 to 3 a.m. on September 17, 2017, he was visiting someone's residence and went outside to find his pickup was missing. After taking most of the information for the report, Negrete returned to his patrol vehicle, and Benson went to his apartment, where he located his identification and then provided it to Negrete.

Det. Derek Mois testified that he works on a team within the homicide division led by Ratliff and in which Davis was a member. This team was assigned the Womack homicide, and Davis was its lead detective. Mois explained that through initial investigation, the Department had acquired and released to the public details and photographs of a potential suspect's vehicle. Pursuant to calls from the public describing the location of a pickup matching the released information, officers were able to locate a pickup matching the description and observed particular identifiers known by the Department. This pickup was registered to Benson and to Jefferson, and Mois explained that Davis obtained a search warrant to collect and process it. The processing of the pickup revealed items

including shell casings and a September 18, 2017, receipt from a Hy-Vee grocery store on 96th and Q Streets in Omaha, Nebraska. Mois testified that he conducted followup with Hy-Vee employees and watched Hy-Vee's video surveillance, which showed Benson with his pickup at around 2 p.m., about 3 hours before Womack was shot.

Mois testified that on September 20, 2017, he fielded a call from a man identifying himself as the owner of the pickup which had been seized the day before. The man was concerned about reports that the pickup had been used in connection with a crime and wanted to report it as stolen. Mois told the man that if he had not been in possession of the pickup and believed it was stolen, he first needed to call the 911 emergency dispatch service to issue a report. The parties did not discuss the matter further, and Mois informed Ratliff of the call once he hung up. Mois explained that at the time of the call, the team only had reason to believe the pickup was potentially involved in a crime and had no other reasons to suspect that Benson, as the owner of the pickup, was himself involved.

Mois described that he was in his Department office on September 23, 2017, when Davis interviewed Benson concerning the pickup and the evidence conflicting with the report Benson gave to Negrete. At that point, Mois explained, investigators suspected Benson's participation in Womack's homicide due to the identification of his pickup, evidence found in the search of the pickup, and evidence contradicting Benson's report that his pickup was stolen. Mois testified that the interview was conducted on the fourth floor of Department headquarters in a homicide interview room. Mois had been in and out of a conference room where detectives could listen in on the interview, and he later reviewed a recording of the interview.

Mois explained that Davis read Benson his *Miranda* rights and that Benson waived his rights and agreed to speak. Davis initially asked Benson for details surrounding the theft of his pickup, and Benson's answers did not vary substantively from

the report he gave Negrete. After this initial questioning, Davis left the room for around 90 seconds, and when he returned, Mois described that the questioning changed. For about the next 1½ hours, Davis confronted Benson about evidence which contradicted his report and repeatedly brought up the evidence that showed Benson with the pickup at Hy-Vee after the time he reported the pickup had been stolen. Benson was arrested after the interview once Davis had an opportunity to confer with Ratliff and possibly the county attorney's office.

Davis also testified concerning Benson's interview on September 23, 2017. According to Davis, Ratliff had informed him earlier in the day that Benson would be coming in for the interview. Davis' first interaction with Benson was after he had already been led into the interview room by other law enforcement personnel. Davis explained that he performed a pat-down search, introduced himself, and asked Benson identifying information. At this point, Davis read Benson his *Miranda* rights and Benson waived those rights and agreed to speak with Davis. For around the first 45 minutes, Davis and Benson discussed Benson's report. However, Davis was aware of Benson's previous statements to Negrete and the evidence contradicting his allegations and the timeline. Davis left the interview room briefly, and when he returned, his questioning shifted to confronting and questioning Benson about the contradictions, including the evidence about his presence at Hy-Vee with the pickup after he alleged that it had been stolen. Davis explained that this shift in questioning was because he first wanted to give Benson an opportunity to provide clarifying information that explained the contradictions. After the interview, Benson was arrested.

Following the hearing, the district court denied Benson's motion. The court found Benson's September 20, 2017, statements to Negrete were admissible because Benson was not in custody when Negrete was taking his report and, as such, Benson was not required to make a knowing and voluntary waiver of his *Miranda* rights before he could be questioned.

The court also found Benson's September 23 statements to Davis were admissible because Davis informed Benson of his *Miranda* rights, Benson waived his rights and agreed to talk to Davis, and there is no requirement that law enforcement officers fully inform a suspect of all the evidence they have before that suspect can make a knowing and voluntary waiver.

## Motion to Suppress
### Cell Phone Data

Benson filed an additional motion to suppress any and all evidence obtained from the execution of a search warrant of Benson's cell phone data. Benson argued that the search warrant and application were facially invalid due to their use of an incorrect date and that there was insufficient credible evidence to establish the necessary probable cause.

A hearing was held in which Davis testified that on September 20, 2017, he applied for a search warrant for telephone numbers connected to Benson, which was granted. Davis explained that the county attorney's office notified him in November 2018 that there appeared to be a discrepancy with some of the dates in the search warrant and application. Davis subsequently reviewed the search warrant and observed typographical errors. Davis testified he did not know about the incorrect date at the time of applying, executing, or returning the search warrant.

Although Davis filled out the application and search warrant on September 20, 2017, the application and search warrant listed September 18, which is the date of Womack's homicide, as the date the application and warrant were filled out and signed. Davis explained he used a template created by the Department's forensic unit and that when he mistakenly put September 18 into the application, the template automatically filled in that date throughout the application and search warrant.

The narrative portion of the affidavit in support of the application lists correct dates in the timeline of the offense and

investigation, including reference to the September 20, 2017, execution of a different search warrant. Additionally, the order to seal attached to the search warrant and signed by the court was dated September 20, 2017, and the return and inventory filed by Davis described serving the warrant on September 20. A fax cover sheet sent with the application for the cell service carrier to execute the search warrant, a confirmation sheet from the fax machine to confirm the fax was sent, and emailed correspondence with the cell service carrier also listed September 20.

Following the hearing, the district court denied Benson's motion. The court found that there was sufficient evidence to establish probable cause and that the erroneous dates appearing on the application and search warrant were inadvertent errors which did not affect their validity.

## Motion to Sever

Benson filed a motion to sever the charges of second degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person from the two counts of tampering with a juror, witness, or informant. Benson argued that the claimed offenses were not similar in character and that Benson would be prejudiced in the joining of the charges.

The district court overruled Benson's motion. The court found that the counts were properly charged in the second amended information and that joining the tampering charges to the other charges would not prejudice Benson pursuant to Neb. Rev. Stat. § 29-2002(3) (Reissue 2016).

## Trial

Evidence presented at trial showed that around 4:30 p.m. on September 18, 2017, law enforcement responded to 911 calls regarding a shooting at the intersection of 60th and L Streets in Omaha. Officers observed a man, later identified as Womack, lying on the median near the intersection. Medical personnel arrived, took over Womack's care, and transported

him to a hospital where he later died from his wounds. Officers discovered a spent "5.7 by 28 caliber casing" on the ground at the scene.

Officers interviewed witnesses as part of their initial investigation. These witnesses, taken together, indicated that Womack and a tan-colored pickup with two occupants were stopped at a red light. Womack's semi-truck was in a through lane while the tan-colored pickup was stopped in a left-turn lane. Womack got out of his semi-truck, approached the pickup, hit the pickup's window with his hand, and said something to the occupants. Womack then turned around and began walking back to his semi-truck, and one of the pickup's occupants fired a gun which hit Womack twice in the back. The pickup then ran the red light, turned left, and sped off.

Law enforcement obtained video recordings from nearby businesses and vehicles at the intersection. From these videos, officers were able to develop a description of the pickup as an older, tan-colored extended-cab model with heavily tinted windows, noticeable damage to the rear quarter panels, and a distinctive rear bumper sticker. The video from a vehicle also allowed officers to confirm that there were two occupants in the pickup, gunshots came from the pickup, and the pickup ran the red light after the shooting. Additionally, this video showed movement of the passenger in the pickup as the shots were being fired.

The Department released still images from the videos displaying the pickup to the media for the public's help in its identification. On September 19, 2017, a Department detective received a telephone call from a special agent who relayed that one of his informants had seen the images of the pickup on the news and believed it belonged to Benson and was parked in a parking lot at 46th and Cass Streets in Omaha. Pursuant to this information, officers, including that detective, went to the parking lot and found a pickup matching the description.

The search and processing of the pickup on the morning of September 20, 2017, revealed a Hy-Vee receipt for flowers

from the store on 96th and Q Streets on September 18 at 1:06 p.m., two spent casings of the same caliber as the one found at the scene, gunshot residue from various parts of the passenger area, and a receipt from an automobile dealership and the pickup's registration indicating Benson and Jefferson were its owners. Following up on the Hy-Vee receipt, Mois obtained video from the Hy-Vee store which showed Benson entering and leaving the store, by himself. The video also showed Benson returning to the pickup around 1 p.m. on September 18.

Later on September 20, 2017, another detective went to the dealership named on the receipt, where he obtained records for the sale of the pickup, including Benson's cell phone number. The dealership had a lien on the pickup and had access to a tracking device on it, data from which the dealership provided law enforcement. This tracking device did not constantly record. Instead, it recorded locations during periodic "health check[s]" and whenever the pickup was turned on or off, which the device determined when it detected movement above a certain threshold or stopped moving for a certain period of time. The tracking device recorded that during data entries on September 17 at around 12:43 a.m., 6:44 a.m., and 7:49 p.m., the pickup was parked in the same location. Additionally, the tracking data recorded that the pickup was at the Hy-Vee parking lot on 96th and Q Streets on September 18 at 1 p.m.

Benson's cell phone records provided data which law enforcement was able to use to estimate the locations of his cell phone around the time of Womack's homicide. These records included a 4:30 p.m. call which put the cell phone around the intersection at 60th and L Streets.

At Benson's direction, Jefferson called law enforcement on September 20, 2017, to report that the pickup had been stolen on September 17. Benson had previously told Jefferson that the pickup was stolen but did not tell her to report it until September 20. Negrete went to their apartment to follow up on

the report, and Benson alleged that the pickup was stolen on September 17.

During the execution of a search warrant of Benson's apartment on September 22, 2017, officers discovered clothing that matched what Benson was wearing in the Hy-Vee video. Testing of samples taken from this clothing revealed the presence of gunshot residue.

On September 23, 2017, Benson went to Department headquarters and was interviewed by Davis concerning the alleged theft of his truck. After an initial discussion where Davis asked about Benson's allegations, Davis confronted Benson about the evidence which contradicted his timeline. Benson maintained he was not involved in Womack's homicide, and at the end of the interview, Benson was arrested.

Jefferson testified that she and Benson were in an intimate relationship and that they had children together. Benson, Jefferson, and the children lived together in the apartment, but Benson did not always stay there. Jefferson identified the suspect pickup as Benson's, explained that Benson had asked her to report it as stolen, and testified that Benson did not stay at the apartment the night of the shooting.

Guitron worked with and was also in an intimate relationship with Benson. Guitron testified that Benson bought her flowers on the afternoon of September 18, 2017, and confirmed text messages he sent her, including two from around the time of the shooting that said "just got in2 sum shitt" and that he could not text anything else about it.

Law enforcement recorded telephone calls from Benson to Jefferson and Guitron while Benson was in jail. During these calls, Benson told Jefferson and Guitron at different times not to cooperate with the authorities.

Marvin Stockdale, who was in jail at the same time as Benson, testified that he and Benson had a conversation while in a holding cell. Stockdale explained that Benson talked with him about his case and said, among other things, that he "'got rid of the gun after [he] smoked the dude'" and that he

was worried about the forensics on the hooded sweatshirt and whether investigators would find gunpowder on it. Additionally, Stormy Figueroa, a friend and coworker of Benson's, said that she talked with him about the shooting and that Benson said, "'Well, yeah, I mean, if somebody like that came in my property, then, yeah, I'd shoot him, too.'"

Following the presentation of evidence and arguments from the parties, Benson was found guilty and sentenced to 40 to 50 years' imprisonment for second degree murder, 20 to 25 years' imprisonment for use of a deadly weapon to commit a felony, 5 to 10 years' imprisonment for possession of a deadly weapon by a prohibited person, and 1 to 2 years' imprisonment on each count of tampering with a witness.

## ASSIGNMENTS OF ERROR

Benson assigns, restated, that the district court erred by (1) failing to suppress Benson's statements to Negrete on September 20, 2017; (2) failing to suppress Benson's statements to Davis on September 23; (3) failing to suppress Benson's cell phone data acquired pursuant to a search warrant issued on September 20; and (4) overruling Benson's motion to sever the two tampering counts from the initial charges. Benson also assigns there was insufficient evidence to support his convictions.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[1] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[2]

---

[1] *State v. Brye*, 304 Neb. 498, 935 N.W.2d 438 (2019).

[2] *Id*.

[2] A trial court's denial of a motion to sever will not be disturbed on appeal absent an abuse of discretion.[3]

[3] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[4] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[5]

## ANALYSIS

### Benson's September 20, 2017, Statements

Benson claims his statements to Negrete on September 20, 2017, should have been suppressed because he was subjected to custodial interrogation and was not advised of his *Miranda* rights. Benson argues he was detained by Negrete during the encounter as evidenced by his attempt to return to his apartment and Negrete's continued questioning.

[4-6] *Miranda v. Arizona*[6] prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination. *Miranda* requires law enforcement to give a particular set of warnings to a person in custody before interrogation, including that he or she has the right to remain silent, that any statement he or she makes may be used as evidence against him or her, and that he

---

[3] See *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015).

[4] *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017); *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017).

[5] *Mendez-Osorio, supra* note 4; *Jedlicka, supra* note 4.

[6] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). See, also, *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014).

or she has the right to an attorney.[7] These warnings are considered prerequisites to the admissibility of any statement made by a defendant during custodial interrogation.[8]

[7-10] *Miranda* warnings are required only when a suspect interrogated by the police is in custody.[9] The ultimate inquiry for determining whether a person is in custody is whether there is a formal arrest or restraint on freedom of movement of degree associated with a formal arrest.[10] Custody is to be determined based on how a reasonable person in the suspect's situation would perceive his or her circumstances.[11] Stated another way, a seizure under the Fourth Amendment occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.[12]

[11] In considering whether a suspect is in custody for *Miranda* purposes, relevant considerations include, but are not limited to the location of the interaction, who initiated the interaction, the duration of the interaction, the type and approach of questioning, the freedom of movement of the suspect, the duration of the interaction, and whether the suspect was placed under arrest at the termination of the interaction.[13]

Here, Benson was not in custody during his interaction with Negrete on September 20, 2017. Benson initiated the interaction by asking Jefferson to call and report the pickup as stolen. Negrete was assigned the task of taking the stolen vehicle report and arrived at Benson's apartment complex, where he made contact with Benson. Throughout the conversation,

---

[7] *Miranda, supra* note 6. See, also, *Juranek, supra* note 6.

[8] *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019).

[9] *Id*.

[10] *Id*.

[11] *Id*.

[12] See *State v. Schriner*, 303 Neb. 476, 929 N.W.2d 514 (2019).

[13] See *Montoya, supra* note 8. See, also, *U.S. v. Axsom*, 289 F.3d 496 (8th Cir. 2002); *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

the parties' discussion was centered on the alleged theft of Benson's pickup, which he requested to have documented in the report. The majority of the conversation occurred outside in the apartment's parking lot. Benson's movement was not substantially restricted, and at one point, the parties separated with Negrete returning to his vehicle and Benson going to his apartment to get proof of identification. The interaction was not uncommonly long, and at the conclusion, Benson was not placed under arrest.

Benson argues that his movement was restricted when, after Negrete asked for identification, Benson turned to get his identification from his apartment but Negrete continued to question him in the parking lot instead. Contrary to Benson's argument, this exchange is insufficient to show Benson was restricted in his movement or ability to leave and terminate the conversation. This exchange occurred shortly after the conversation began with Negrete's getting Benson's name and asking whether he had any identification on him. Benson did not have his identification with him, and Negrete asked him whether his identification was in the apartment. At that point, Benson turned to go back to apartment, but before he left, Negrete shifted the conversation by asking questions about the theft Benson sought to report. In context, Benson was not turning to leave and terminate the conversation but was, instead, seeking to continue the interaction by getting the documentation he thought Negrete wanted. This exchange, on its own, does not demonstrate that Benson was in custody requiring *Miranda* warnings.

Benson also points to Ratliff's participation in assigning Negrete to take the report. Benson argues that this fact, coupled with Negrete's previous knowledge of Womack's homicide and the use of his body camera to record the interaction, establishes that Negrete's taking of Benson's report was "plainly to gain a statement from a homicide suspect in a manner that the suspect would not at all anticipate or contemplate."[14]

---

[14] Brief for appellant at 30.

[12] Regardless of Ratliff's or Negrete's intent, the test for determining custody is an objective inquiry that does not depend on the subjective views harbored by either the interrogating officer or person being interrogated.[15] Instead, the question is determined based on how a reasonable person in the suspect's situation would perceive the circumstances.[16]

As the district court found, under the totality of the circumstances, a reasonable person would not have believed he or she was unable to leave or terminate the interaction. Benson initiated the interaction, which occurred in an open, neutral space; the subject of the interaction was limited to Benson's report on his allegedly stolen pickup; Benson was not restricted in his movements; and the interaction was a relatively short one after which Benson was not arrested. Benson was not in custody, and Negrete was not required to provide *Miranda* warnings. Accordingly, the district court did not err in declining to suppress Benson's September 20, 2017, statements.

### Benson's September 23, 2017, Statements

Benson assigns the district court should have suppressed his statements to Davis on September 23, 2017, because he did not knowingly and voluntarily waive his *Miranda* rights.

[13,14] To be a valid waiver of *Miranda* rights, a waiver must be knowingly and voluntarily made.[17] A waiver is knowing if it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.[18] A waiver is voluntary if it is the product of a free and deliberate choice rather than through intimidation, coercion, or deception.[19] Whether a knowing and voluntary waiver

---

[15] *Montoya, supra* note 8.

[16] *Id*.

[17] See, *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018); *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

[18] *Id.*

[19] *Id.*

has been made is determined by looking to the totality of the circumstances.[20]

There is no dispute that the September 23, 2017, interview occurred after Benson was fully advised of his *Miranda* rights and that Benson issued a waiver of those rights and agreed to speak with Davis. There is also no dispute that Benson had reason to believe the interview would concern the report of his allegedly stolen pickup, which report Benson indicated to Mois he wished to make because he was worried about reports it was involved in a homicide.

Benson, instead, argues this *Miranda* waiver was insufficient because he did not know that he was a suspect in Womack's homicide and that Davis had evidence contradicting his report. Benson also claims Davis misled him during the interview by using Benson's lack of knowledge presumably to gain a "tactical edge" in the interview and get Benson to incriminate himself.[21]

[15] While waiver must be knowingly made, law enforcement is not required to inform a suspect of all aspects of the investigation prior to the waiver of the suspect's *Miranda* rights. In *Colorado v. Spring*,[22] the U.S. Supreme Court stated, "'[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.'" The Court explained:

> This Court's holding in *Miranda* specifically required that the police inform a criminal suspect that he has the right to remain silent and that *anything* he says may be used against him. There is no qualification of this broad and explicit warning. The warning, as formulated in *Miranda*, conveys to a suspect the nature of his

---

[20] *Id.*

[21] Brief for appellant at 34.

[22] *Colorado v. Spring*, 479 U.S. 564, 576-77, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987).

constitutional privilege and the consequences of abandon-
ing it. Accordingly, we hold that a suspect's awareness
of all the possible subjects of questioning in advance of
interrogation is not relevant to determining whether the
suspect voluntarily, knowingly, and intelligently waived
his Fifth Amendment privilege.[23]

Davis was not required to disclose his strategy for the
interview or his knowledge of contradictory evidence prior
to Benson's waiver. Davis was not required to explain to
Benson the interrogation strategy Davis planned to use or to
disclose to Benson the evidence Davis possessed contradict-
ing Benson's stolen vehicle report. Davis was merely required
to advise Benson of his *Miranda* rights. Davis read Benson
a sufficient explanation of these rights, and Benson chose to
waive them.

Benson cites several instances where he claims Davis made
misleading statements that indicated he was concerned only
about the return of Benson's allegedly stolen pickup, and, as
such, Benson argues such representation prohibited a knowing
and voluntary waiver because it caused Benson to be unaware
of the actual topic of discussion. It is unclear how Benson is
claiming these statements led to an invalid waiver, because
they were made after Benson was read and waived his *Miranda*
rights. Regardless, and contrary to Benson's argument, he was
informed of the nature of the interview. As explained above,
Benson had called Mois seeking to report his pickup as stolen
due to concerns it may have been involved in Womack's shoot-
ing. He then provided a report to Negrete alleging someone
had stolen the pickup the day before Womack was killed. It
is unchallenged that all parties understood the September 23,
2017, interview as followup to this report.

[16] Benson also takes issue with Davis' shift in ques-
tioning from asking questions to clarify Benson's report to
confronting Benson on evidence contradicting his report. As

---

[23] *Id.*, 479 U.S. at 577.

explained above, Davis was not required to reveal his inter-
rogation strategy prior to Benson's waiver. Additionally, to the
extent Benson's argument could be claiming that the differ-
ence in interview strategy would necessitate a further waiver,
we have previously stated that law enforcement officers "'are
not required to rewarn suspects from time to time.'"[24] The
*Miranda* rule and its requirements are met if a suspect receives
adequate *Miranda* warnings, understands them, and has an
opportunity to invoke the rights before giving any answers or
admissions.[25]

In consideration of all of the above, Benson's waiver of his
*Miranda* rights before the interview with Davis was knowingly
and voluntarily given and the district court did not err in declin-
ing to suppress Benson's September 23, 2017, statements.

### Search Warrant For Benson's Cell Phone Data

Benson's assignment that the district court erred in failing to
suppress his cell phone data centers on his argument that the
search warrant granting access to this data was invalidly defi-
cient due to misstatements of the warrant and the application's
drafting and approval date.

The Fourth Amendment to the U.S. Constitution provides
that warrants may not be granted "but upon probable cause,
supported by Oath or affirmation, and particularly describ-
ing the place to be searched, and the persons or things to
be seized." The Nebraska Constitution, under article I, § 7,
similarly provides that "no warrant shall issue but upon prob-
able cause, supported by oath or affirmation, and particularly
describing the place to be searched, and the person or thing to
be seized."

[17-20] In reviewing the strength of an affidavit submitted
as a basis for finding probable cause to issue a search warrant,

---

[24] *Burries, supra* note 17, 297 Neb. at 389, 900 N.W.2d at 504.

[25] *Id.*

an appellate court applies a totality of the circumstances test.[26] The question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.[27] Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found.[28] In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued.[29]

Benson argues that the application and search warrant fail to provide an "accurate timeline for the events" and make no "chronological sense" due to their use of an incorrect drafting and approval date.[30] As such, Benson claims, they fail to provide sufficient probable cause.

We disagree with Benson's description that the application and warrant fail to provide an accurate timeline of the events to establish probable cause. The incorrect dates used in the application and warrant were limited to descriptions of when the application and warrant were drafted and approved. These dates are not part of the factual basis the State alleged established probable cause. Instead, the narrative portion of the application, where Davis provided a factual basis for the search, lists correct dates in the timeline of the offense and investigation. Misstating the date the application and warrant were drafted and approved is irrelevant to establishing the timeline of events to determine probable cause.

---

[26] *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019).

[27] *Id*.

[28] *Id*.

[29] *Id*.

[30] Brief for appellant at 37.

[21,22] A search warrant and application's indicating incorrect dates of their drafting and signing is not per se fatal to the validity of a warrant.[31] Misstatements within an application and warrant may still produce a valid warrant if the rest of the warrant and attached application cures any defect resulting from the scrivener's error when read together.[32] For instance, in the context of warrants and applications misstating addresses of a place to be searched, we have held that even if the numerical address is wrong, a warrant may still be valid if the description is adequate to direct the officer to the correct place for the search.[33]

In this case, the totality of the warrant and its attachments establishes that the date misidentified as the date of drafting and approval was a typographical error and sufficiently identifies September 20, 2017, as the correct date of drafting and approval. As noted above, the narrative section of the warrant correctly lists dates in the timeline of the offense and investigation. This section describes events occurring subsequently to September 18, including reference to the execution of a different search warrant on September 20. Additionally, an order to seal was attached to the search warrant which was signed by the court at the time of the search warrant's approval and was dated September 20, 2017.

We conclude the warrant and application's identification of September 18, 2017, as the drafting and approval date was a scrivener's error corrected when the warrant and its attachments are read together. Moreover, the misuse of these dates does not affect the description of the timeline of the offense and investigation which the State offered as the basis for probable cause. As such, the error did not invalidate the warrant and the district court did not err in declining to suppress Benson's cell phone data.

---

[31] See *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019).

[32] *Id*.

[33] See, *State v. Groves*, 239 Neb. 660, 477 N.W.2d 789 (1991); *State v. Walters*, 230 Neb. 539, 432 N.W.2d 528 (1988).

## Motion to Sever

Benson assigns the district court erred in failing to sever the tampering charges. Benson argues the charges are not sufficiently similar to allow for joinder in that the tampering counts have no elemental similarities, were not a common scheme or plan, and concern acts which occurred nearly 17 months after Womack's killing, which precipitated the other counts. Benson asserts he was prejudiced by this joinder because the State offered evidence to establish the tampering clauses that improperly bolstered Jefferson's and Guitron's testimony and "mudd[ied] the evidentiary waters" for the jury.[34]

[23-25] There is no constitutional right to a separate trial.[35] Instead, the joinder or separation of charges for trial is governed by § 29-2002, which states, in relevant part:

> (1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> . . . .
>
> (3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint . . . the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.

Summarized, whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related to be joinable and (2) whether the joinder was

---

[34] Brief for appellant at 41.

[35] See *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

prejudicial to the defendant.[36] There is a strong presumption against severing properly joined counts.[37]

[26,27] While § 29-2002 presents two separate questions, there is no error under either subsection (1) or (3) if joinder was not prejudicial, and a denial of a motion to sever will be reversed only if clear prejudice and an abuse of discretion are shown.[38] An appellate court will find such an abuse only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.[39]

A defendant appealing the denial of a motion to sever has the burden to show compelling, specific, and actual prejudice.[40] Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial.[41]

In the instant case, we need not consider whether the tampering counts were sufficiently related to be properly joined under § 29-2002(1), because Benson has failed to show prejudice from the joinder. Essentially, Benson argues that the evidence of the tampering counts, which indicated he did not want Jefferson or Guitron to provide the State damaging testimony, influenced the jury's verdicts because it made him look guilty and added unwarranted emphasis to Jefferson's and Guitron's testimony.

[28,29] Prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge.[42] Benson does not explain why evidence

---

[36] See *id*. See, also, *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018), *disapproved on other grounds, State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018).

[37] *Cotton, supra* note 36. See, also, *Briggs, supra* note 35.

[38] See *Briggs, supra* note 35.

[39] See *id*.

[40] See *id*.

[41] *Id*.

[42] *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). See, also, *Cotton, supra* note 36.

of Benson's telephone calls with Jefferson and Guitron would be inadmissible in a separate trial on the other three charges. Evidence of a defendant's attempted intimidation or intimidation of a State's witness is relevant evidence of a defendant's "'conscious guilt'" that a crime has been committed.[43] Accordingly, Benson's calls with Jefferson and Guitron could be admissible as relevant to Benson's consciousness of guilt in a separate trial.

[30] Additionally, joined charges do not usually result in prejudice if the evidence is sufficiently simple and distinct for the jury to easily separate evidence of the charges during deliberations.[44] The jury in this case would have been able to easily separate the evidence of the charges during deliberations in that the evidence that Benson tampered with witnesses was distinct. While the telephone calls may have been relevant to the other charges and a consciousness of guilt, it was clear they were offered to show Benson was attempting to get Jefferson and Guitron not to participate in his prosecution.

Because Benson failed to establish prejudice from the joinder of the charges, the district court did not abuse its discretion in overruling Benson's motion to sever.

## Sufficiency of Evidence

On his sufficiency of the evidence assignment of error, Benson first argues that the State presented insufficient evidence on the second degree murder, use of a deadly weapon, and possession of a deadly weapon charges. Benson argues the State failed to meet its burden to show that he was in the pickup at the time of the shooting and that he fired the gun.

As Benson acknowledges, the State did present evidence as to these elements. Evidence was received that Benson owned the pickup that was identified by witnesses and video as being the pickup from which the shots were fired that hit Womack and resulted in his death. Gunshot residue was

---

[43] *State v. Thorpe*, 280 Neb. 11, 24, 783 N.W.2d 749, 761 (2010).

[44] *Briggs, supra* note 35.

discovered inside the pickup along with a casing that matched the same weapon as the casing found at the scene. Benson's cell phone location put him in the area around the time of the shooting, and the Hy-Vee video showed Benson driving the truck 3 hours before the shooting. Gunshot residue was found on clothes matching the clothes Benson was wearing in the Hy-Vee video.

Witnesses testified as to statements Benson made indicating his participation. Guitron testified that Benson texted her around the time of the incident that he had "just got in2 sum shitt" but could not text anything about it. Figueroa testified that she talked with Benson about the shooting and that he said, "'Well, yeah, I mean, if somebody like that came in my property, then, yeah, I'd shoot him, too.'" Finally, Stockdale testified that in talking with Benson about his case, Benson said that he "'got rid of the gun after [he] smoked the dude'" and that he was worried about the forensics on the hooded sweatshirt and whether investigators would find gunpowder on it.

The court also received evidence of Benson's consciousness of guilt in his lying to law enforcement about the pickup's being stolen the night before the homicide and contacting witnesses to encourage their noncooperation with the prosecution of his case.

Benson seeks to overcome this evidence by contesting the credibility of Stockdale and Figueroa and the weight of the evidence of gunshot residue and the cell phone location. However, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh evidence when determining the sufficiency of the evidence.[45] The jury, as the finder of fact, heard Stockdale's and Figueroa's testimony, weighed the evidence of the gunshot residue and cell phone location evidence, and determined Benson was in the pickup and was the shooter. We conclude, viewing the evidence in the

---

[45] See *Mendez-Osorio, supra* note 4; *Jedlicka, supra* note 4.

light most favorable to the State, that there was sufficient evidence to support the jury's finding of these essential elements beyond a reasonable doubt.

As to the two counts of tampering with a witness, Benson claims the State failed to meet its burden to prove he intended to tamper with or obstruct Jefferson and Guitron from testifying or cooperating with law enforcement. Benson argues that the State did not offer any evidence to directly establish intent and that it was "just as plausible" that he wanted the two women, with whom he was in romantic relationships, "not [to] cross paths as they likely would if both participated in the investigation."[46]

When viewed in the light most favorable to the State, there was again sufficient evidence for the jury to find the essential elements of the tampering charges. Benson was charged under Neb. Rev. Stat. § 28-919(1) (Reissue 2016), which provides, in relevant part:

> (1) A person commits the offense of tampering with a witness . . . if, believing that an official proceeding or investigation of a criminal . . . matter is pending . . . , he or she attempts to induce or otherwise cause a witness or informant to:
>
> (a) Testify or inform falsely;
>
> (b) Withhold any testimony, information, document, or thing;
>
> (c) Elude legal process summoning him or her to testify or supply evidence; or
>
> (d) Absent himself or herself from any proceeding or investigation to which he or she has been legally summoned.

The State's evidence of Jefferson's and Guitron's telephone calls with Benson provided sufficient basis for finding the required elements that Benson knew of his pending criminal case and that he acted to induce or cause Jefferson and Guitron

---

46 Brief for appellant at 48.

to refuse to comply with several subpoenas in the prosecution of that case. The recordings of these calls include Benson's statement to Jefferson regarding her subpoena from the county attorney's office, "'You are not going to go down there.'" Also included is Benson's statement to Guitron, "'You don't have to come and you don't have to testify against me.'" Even if Benson were correct that the only reason for his telephone calls was to prevent Jefferson and Guitron from crossing paths, there was still evidence that he attempted to induce them not to testify or cooperate with law enforcement. Under § 28-919, a defendant's reasons for attempting to induce a witness to commit any of the acts enumerated in it are not relevant.

We find that the State did present sufficient evidence for the jury to find the existence of the essential elements under § 28-919(1).

## CONCLUSION

We conclude that Benson was not under custody for *Miranda* purposes in his September 20, 2017, interview with Negrete, that Benson knowingly and voluntarily waived his rights and agreed to speak with Davis in his September 23 interview, and that the search warrant for Benson's cell phone data was not invalidated by the mistaken use of incorrect dates on the warrant and application. Further, Benson did not establish adequate prejudice from the joinder of his charges and the district court did not abuse its discretion in overruling his motion to sever. Finally, there was sufficient evidence to support the verdicts. Benson's convictions are affirmed.

Affirmed.