Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/27/2022 08:05 AM CDT

State of Nebraska, appellee, v.
Keith Bedford, appellant.
___ N.W.2d ___

Filed September 20, 2022.    No. A-21-596.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

2. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

3. **Jury Instructions: Proof: Appeal and Error.** In order to establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

4. **Judgments: Appeal and Error.** Regarding matters of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review.

5. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh evidence, as such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

6. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal

is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

7. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued to be considered by an appellate court.

8. **Courts: Records: Claims.** It is not the duty of a court to scour the record in search of facts that might support a claim.

9. **Self-Defense.** Self-defense is a statutorily affirmative defense in Nebraska.

10. **Self-Defense: Jury Instructions: Evidence.** In the context of a self-defense instruction, a trial court must instruct the jury on the issue of self-defense when there is any evidence adduced which raises a legally cognizable claim of self-defense.

11. **Self-Defense: Claims.** To successfully assert the claim of self-defense, one must have a both reasonable and good faith belief in the necessity of using force.

12. **Self-Defense.** The force used in defense must be justified under the circumstances.

13. **Jury Instructions: Evidence.** A trial court is not required to give an instruction where there is insufficient evidence to prove the facts claimed; however, it is not the province of the trial court to decide factual issues even when it considers the evidence produced in support of one party's claim to be weak or doubtful.

14. **Self-Defense: Jury Instructions: Evidence.** It is only when the evidence does not support a legally cognizable claim of self-defense, or the evidence is so lacking in probative value as to constitute a failure of proof, that a trial court may properly refuse to instruct a jury on a defendant's theory of self-defense.

15. **____: ____: ____.** That a slight amount of evidence may ultimately be insufficient for the defendant to prevail on his or her claim of self-defense does not bear on whether a self-defense instruction should have been given by the trial court.

16. **Self-Defense: Jury Instructions: Juries: Evidence.** Only where the jury could reasonably find that the defendant's use of force was justified should the trial court instruct the jury on self-defense; however, it is not enough to merely show any evidence of self-defense to support an instruction thereon.

17. **Jury Instructions: Appeal and Error.** Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires

reversal only if the error adversely affects the substantial rights of the complaining party.

18. **Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict surely would have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

19. **Jury Instructions: Appeal and Error.** It is the duty of the trial judge to instruct the jury on the pertinent law of the case, whether requested to do so or not, and an instruction or instructions which by the omission of certain elements have the effect of withdrawing from the jury an essential issue or element in the case are prejudicially erroneous.

20. **Criminal Law: Evidence: New Trial: Appeal and Error.** Upon finding reversible error in a criminal trial, an appellate court must determine whether the total evidence admitted by the district court, erroneously or not, was sufficient to sustain a guilty verdict.

21. **Evidence: New Trial: Double Jeopardy: Appeal and Error.** If evidence is not sufficient to sustain a verdict after an appellate court finds reversible error, then double jeopardy forbids a remand for a new trial.

22. **Criminal Law: Judgments: Convictions: Appeal and Error.** An appellate court may reverse a criminal judgment in part and affirm the judgment in part where the reversed conviction is separate and distinct from the remaining convictions.

23. **Witnesses.** A defendant's reasons for attempting to induce a witness to commit any of the acts enumerated in Neb. Rev. Stat. § 28-919(1) (Cum. Supp. 2020) are not relevant.

24. **Effectiveness of Counsel: Records: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record.

25. ____: ____: ____. Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit, or in the rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial.

26. ____: ____: ____. An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice.

27. **Effectiveness of Counsel: Proof.** Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

28. \_\_\_\_: \_\_\_\_. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

29. **Effectiveness of Counsel: Proof: Words and Phrases.** To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

30. **Effectiveness of Counsel: Speedy Trial.** When a defendant alleges he or she was prejudiced by trial counsel's failure to properly assert the defendant's speedy trial rights, the court must consider the merits of the defendant's speedy trial rights under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Only if a motion would have resulted in the defendant's absolute discharge, thus barring a later trial and conviction, could the failure to move for discharge be deemed ineffective assistance.

31. **Constitutional Law: Speedy Trial.** Determining whether a defendant's constitutional right to a speedy trial has been violated requires a balancing test in which the courts must approach each case on an ad hoc basis. That test involves consideration of four factors: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant.

32. \_\_\_\_: \_\_\_\_. In analyzing the prejudice factor of the four-factor test to determine whether constitutional speedy trial rights have been violated, the U.S. Supreme Court enumerated three aspects: (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern of the defendant, and (3) limiting the possibility that the defense will be impaired by dimming memories and loss of exculpatory evidence.

33. **Effectiveness of Counsel: Proof: Appeal and Error.** When making an ineffective assistance of counsel claim on direct appeal, allegations of prejudice are not required. However, a defendant must make specific allegations of the conduct that he or she claims constitutes deficient performance.

34. **Effectiveness of Counsel: Appeal and Error.** General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review.

35. **Trial: Attorneys at Law: Effectiveness of Counsel: Appeal and Error.** When reviewing claims of alleged ineffective assistance of counsel, an appellate court affords trial counsel due deference to formulate trial strategy and tactics.

36. **Effectiveness of Counsel: Presumptions: Appeal and Error.** There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions.

37. **Judgments: Effectiveness of Counsel: Appeal and Error.** Even if found unreasonable, error owing to ineffective assistance of counsel justifies setting aside the judgment only if there was prejudice.

38. **Trial: Joinder: Appeal and Error.** Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related to be joinable and (2) whether the joinder was prejudicial to the defendant.

39. **Trial: Joinder: Presumptions.** There is a strong presumption against severing properly joined counts.

40. **Trial: Joinder: Juries: Evidence.** Joined charges do not usually result in prejudice if the evidence is sufficiently simple and distinct for the jury to easily separate evidence of the charges during deliberations.

41. **Trial: Joinder.** Prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge.

Appeal from the District Court for Lancaster County: Robert R. Otte, Judge. Affirmed in part, and in part reversed and remanded for a new trial.

Joseph D. Nigro, Lancaster County Public Defender, and John C. Jorgensen for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

Pirtle, Chief Judge, and Bishop and Welch, Judges.

Per Curiam.

## I. INTRODUCTION

Following a jury trial in the Lancaster County District Court, Keith Bedford was convicted of one count of assault by strangulation, two counts of third degree domestic assault, and one count of tampering with a witness. He was found

not guilty of a third count of third degree domestic assault. On appeal, Bedford claims that the district court erred in preventing the impeachment of the victim's testimony and in failing to give his requested self-defense jury instruction. He also asserts that the evidence was insufficient to sustain his convictions and that he received ineffective assistance of trial counsel for multiple reasons. Because we find error in the court's refusal to instruct on self-defense as to one count of third degree domestic assault, we affirm in part and in part reverse the court's judgment and remand the cause for a new trial.

## II. BACKGROUND

Bedford and Jessica Bedford (Jessica) met in June 2017 through a mutual friend and began a romantic relationship approximately 1 month later. They moved in together shortly thereafter, separated for various periods, and were married in December 2019. Beginning in July 2019 and continuing through April 2020, several incidents occurred involving Bedford and Jessica, including physical altercations, which resulted in the filing of criminal charges against Bedford.

Bedford was arrested on May 1, 2020, and the State filed an information on August 13 charging Bedford with five counts: count 1, assault by strangulation or suffocation, a Class IIIA felony, in violation of Neb. Rev. Stat. § 28-310.01(1) (Cum. Supp. 2020); counts 2 through 4, third degree domestic assault with a prior conviction, each a Class IIIA felony, in violation of Neb. Rev. Stat. § 28-323(1) (Reissue 2016); and count 5, tampering with a witness, a Class IV felony, in violation of Neb. Rev. Stat. § 28-919(1) (Cum. Supp. 2020). Counts 1 and 2 related to an incident occurring in April 2020, count 3 stemmed from an October 2019 incident, and count 4 arose from a July 2019 incident. Count 5 related to a phone call between Bedford and Jessica on October 7, 2019, while Bedford was incarcerated. The State filed an amended information on June 2, 2021, alleging the same five counts and charging Bedford as a

habitual criminal in connection with count 5, pursuant to Neb. Rev. Stat. § 29-2221 (Reissue 2016).

Trial commenced on June 7, 2021, and closing arguments were made on June 10. Evidence was adduced, including the testimonies of Jessica, her son, her grandmother, Bedford's girlfriend and members of her family, a registered nurse, and several law enforcement officers. Bedford also testified in his own behalf. We begin by setting forth the conflicting narratives regarding each incident underlying the multiple counts charged against Bedford.

### 1. July 2019 Incident

According to Jessica, she and Bedford began to argue on July 19, 2019, over "[m]oney" and "other women," an argument initially sparked over the fact that Bedford had driven a vehicle belonging to a female acquaintance to Jessica's residence. The argument began via text messages and continued into a verbal dispute outside of Jessica's garage. The argument "escalated" into "yelling," and Bedford "pushed" Jessica into her garage door and struck her "with a closed fist" on the "left side of [her] face." Jessica recalled that after being struck, she "felt like [she] couldn't close [her] mouth." Bedford then "[g]rabbed at" Jessica in an effort to "get to [her back] pocket." Jessica then disentangled herself from Bedford and "went around to the side of the house[,] grabbed a rock[,] and tried to throw it at him." The rock missed Bedford and instead struck the windshield of the vehicle belonging to Bedford's female acquaintance. As Bedford began to leave, Jessica followed after the vehicle into the road while "still yelling at him." She then "slipped on some gravel at the end of the driveway" and fell, injuring her hand in the process.

Although Jessica did not call law enforcement to report this incident, an officer came to her home later that evening following a vandalism report made by Bedford's female acquaintance. During the investigative interview, the officer took photographs of Jessica's injuries and Jessica reported what had

occurred between herself and Bedford. Law enforcement made efforts to contact Bedford without success.

Conversely, Bedford described that he had driven to Jessica's home to "pick up some cash that she told [him] she would give" to him. According to Bedford, after he arrived at Jessica's residence, "[s]he came outside and . . . struck [him]," saying that she could not "believe [he] drove this bitch's car to [Jessica's] grandma's house." Afterward, Jessica "came to the driver's side of the [windshield and] threw a rock into the wind[shield]." She then picked up the rock and "threw it into the wind[shield] again." Bedford returned to the vehicle and began to drive away; he had to "look out the passenger's side of the wind[shield]" because it "was so damaged." He "didn't pay attention" to Jessica's conduct as he left, and he drove straight to his female acquaintance's home to explain the damage. At this time, Bedford had a warrant out for his arrest unrelated to the incident, and he did not have any contact with law enforcement following this incident. During the period immediately following the July 2019 incident, Bedford cut off communications with Jessica; thereafter, he left Nebraska for work-related purposes.

## 2. October 2019 Incident

Following Bedford's return to Nebraska in August 2019, he "opened back up to" Jessica and resumed talking with her. He moved back in with her in September, and the two lived together in an apartment for a time.

On October 5, 2019, the two had an argument initially concerning the discipline of Jessica's children. The argument quickly escalated as Bedford and Jessica moved to their bedroom in the apartment. One of Jessica's children remained in the apartment's living room.

According to Jessica, the argument escalated to the point that Bedford was packing up his possessions and preparing to leave. During the course of the argument, Bedford picked up a pair of boots and began making gestures with his arms

while holding the boots. One of the boots hit Jessica in the "corner of [her] eye" and caused it to bruise and swell. She denied that Bedford ever pushed her during this incident, and she did not call law enforcement. However, her child had left the apartment and gone to a nearby police station. Law enforcement arrived shortly thereafter and knocked on the apartment door. Jessica was initially uncooperative with the officers in an effort to protect Bedford, and she believed that her injury was an "accident" that Bedford did not intend to cause. Bedford eventually came outside of the apartment and was taken into custody. Law enforcement subsequently interviewed Jessica, and she told the officers that she had "pushed . . . Bedford and . . . he pushed [her] back," causing Jessica to fall and be injured.

Jessica's son, age 10, testified about an argument Bedford and Jessica had about his having a piece of cake "too early." Bedford and Jessica went into their bedroom, where Jessica's son, in the dining room, "heard them fighting." He heard Jessica crying, and then he heard "a big boom by the wall." He started crying and "ran to some people" and then to a store, from which someone "walked [him] to the police station." Jessica's son testified that he went to the police station because he "knew somebody was hurt because [his] mom was crying" and that "when [he] got back, [Jessica] had a black eye and a busted lip," neither of which she had prior to going into the bedroom with Bedford.

Bedford described that as he and Jessica argued, he told her that he was "tired of arguing with her and . . . was leaving." He began packing his possessions, and Jessica "pushed [him] into the [bedroom] door" to "stop [him] from leaving." As this occurred, she asked Bedford "to stop" and not leave and also said to Bedford that he "wasn't going anywhere." He tried to continue packing, but Jessica "pushed [him] and pinned [him] against" the bedroom door and shoes that were on a shelf fell to the floor. Bedford said that at this point, he "didn't shove" Jessica, but, rather, he "pushed [her] off of [him] and she

tripped over one of [his] shoes" and hit her face on the nearby plastic "bed base." Bedford testified, "I helped her up. I felt that was my fault. Even so, I didn't mean to hurt her." After the police officers knocked on the apartment door, Jessica went out and spoke to them while Bedford remained in the apartment. Jessica texted Bedford regarding her conversation with the officers, and Bedford briefly considered "attempt[ing] to elude the police" because he had warrants for unpaid fines. However, after looking out the bathroom window and realizing how far the fall was, he did not think that the fines were worth "losing [his] life" or "break[ing his] neck" over, so he "eventually . . . did come out." While being arrested, Bedford told Jessica he loved her and he "believe[d] that [he] even apologized to her again."

On cross-examination, Bedford acknowledged that he was "evasive" and initially "lied to law enforcement" after the October 2019 incident. He acknowledged telling law enforcement that Jessica had no injuries and had no reason to have any injuries.

### 3. Jail Phone Call and Other Events

Following his arrest, Bedford was jailed from October 5, 2019, until December 3. Throughout this period, Bedford and Jessica were in frequent communication through letters and phone calls. Bedford testified he made "over 200 calls" to Jessica during that time. The phone call at issue in this appeal occurred on October 7 between Bedford and Jessica. According to Bedford, he was prohibited from calling Jessica at the time as a result of the incident on October 5, in light of which prohibition Jessica instructed him to call her grandmother's home phone number in order to circumvent the restriction. Bedford told Jessica "not [to] come to court" if the State subpoenaed her; Jessica responded by indicating that if she were subpoenaed, she would testify that no domestic assault had occurred and would not otherwise cooperate with the prosecution.

Jessica further referenced a letter she had sent to the county attorney's office in which she described that her reports to law enforcement were not legitimate, and she stated that she would "take a false reporting charge" if needed. At the conclusion of the phone call, Bedford told Jessica that he "need[ed her] to stay focused" and to "[m]ake sure [she] stays on this shit" with respect to the court proceedings.

The letter referenced by Jessica, received as exhibit 7 at trial, described that the reports she had made to police were a result of her anger toward Bedford. According to the letter, Bedford had not assaulted her during the incidents on July 19 and October 5, 2019. Jessica wrote that she "would like to accept responsibility" for the July 19 incident and that she had falsely reported to the responding officer out of anger that Bedford had assaulted her. With respect to the October 5 incident, the letter described an argument consistent with Bedford's account. Jessica further wrote that she had told the responding officers her injury was an accident resulting from her instigation and escalation of the argument, but that the officers did not believe her and told her "they would take [her] kid" away and "take [her] to jail if [she] didn't tell them the truth." Jessica testified at trial that she had "backdated" this letter to October 4 and that she actually wrote this letter "sometime after November 12" after a conversation with Bedford. Jessica stated at trial that the purpose of this letter was so Bedford's "charges would be dropped," and she indicated that its contents were not accurate.

Following his release on December 3, 2019, Bedford and Jessica lived together for approximately 2 months. The two were married later in December, and they remained together until late January 2020, when Bedford moved out of the residence. Bedford explained that he left because the relationship had not improved since the October 2019 incident. In March 2020, Bedford returned to Nebraska and began a relationship with another woman, and he moved in with her shortly after his return. Bedford and Jessica continued to communicate

following his return to Nebraska, although the relationship became significantly more strained.

### 4. April 2020 Incident

Regarding the events of April 4, 2020, the accounts of Bedford and Jessica substantially diverge. On that date, Jessica was at her grandmother's house with her eldest son and her grandmother was also present. According to Jessica, she and Bedford had arranged for a meeting at her grandmother's home in order for Jessica to give Bedford $60 and to return his car's key fob. When Bedford arrived, Jessica met him on the front porch of her grandmother's home. Bedford appeared "upset," and he "pulled [her] into the garage" attached to the residence. The two began to argue, and the argument became physical. Jessica recalled that Bedford began to "choke[]" her as he was talking to her, and "he told [her] that he would leave [her] rotting in the garage." She then described that she fell to the ground and Bedford began striking her. Bedford then left the residence, and Jessica went into the house "crying and screaming" and told her grandmother to call the police. The record indicates that the phone call to the 911 emergency dispatch service occurred at 1:22 p.m. and that "[n]o more than five minutes" had passed between the assault and the 911 call. Law enforcement arrived shortly thereafter, and officers interviewed Jessica and took photographs of her injuries. Bedford and Jessica texted each other on a few occasions after this incident, although Jessica considered their relationship to be over at the time.

Bedford, however, denied ever meeting with Jessica that day. Instead, he described that he spent the entire day with his new girlfriend's family. Bedford's girlfriend had purchased a new video game console for her son the day before, using her "unemployment card." On the morning of April 4, 2020, Bedford cooked breakfast for his girlfriend and her children, and after finishing breakfast "close to noon," Bedford played video games with his girlfriend's son for "three or four, maybe

five hours." During this time, Bedford "never left the house," and he described his vehicle was also "blocked in" by his girlfriend's vehicle, rendering him unable to leave. Bedford made a phone call to Jessica around 1 p.m. concerning his "SNAP card" and the difficulties he was having in acquiring it. According to Bedford, Jessica denied any involvement, and he "stopped talking to her" after her denial because he "knew better." They exchanged a couple more text messages, in which Bedford stated that he would "put a security lock" on his account because Jessica "knew too much of [his] information." Afterward, Jessica attempted to call Bedford multiple times, but he did not answer. Bedford subsequently cooked dinner for his girlfriend and her children, and he did not otherwise leave the residence throughout the remainder of the evening after dinner.

## 5. VERDICTS AND SENTENCING

We will discuss other evidence received at trial in our analysis below when relevant to the errors assigned by Bedford.

After deliberation, the jury found Bedford guilty of counts 1 through 3 and count 5, as well as not guilty of count 4. The district court subsequently entered judgment on the jury's verdicts.

A sentencing hearing was held on July 16, 2021. The district court found Bedford to be a habitual criminal and sentenced Bedford as follows: 10 to 12 years' imprisonment on count 1, 2 to 3 years' imprisonment on count 2, 2 to 3 years' imprisonment on count 3, and 10 to 12 years' imprisonment on count 5. The court ordered that the sentences on counts 1 and 5 be served concurrently; the court further ordered that the sentences on counts 2 and 3 be served consecutively to those on counts 1 and 5 and to each other. Bedford was given 486 days' credit for time served. A written order consistent with the court's oral pronouncement was entered that same day.

Bedford appeals.

## III. ASSIGNMENTS OF ERROR

Bedford claims, reordered, that (1) the district court erred in denying trial counsel's attempt to impeach Jessica at trial, (2) the court erred in refusing his proposed self-defense jury instruction, and (3) the evidence was insufficient to sustain his convictions. He further raises five separate claims of ineffective assistance of trial counsel.

## IV. STANDARD OF REVIEW

[1,2] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Figures, supra*.

[3,4] In order to establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999). Regarding matters of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review. *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997).

[5] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, as such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in

the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Figures, supra*.

[6] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

## V. ANALYSIS

### 1. DENIAL OF OPPORTUNITY
### TO IMPEACH WITNESSES

Bedford claims that the district court denied him "his constitutional right to confrontation because [it] denied him the opportunity to properly impeach [Jessica and her son] at trial." Brief for appellant at 27. Bedford alleges that he was "fundamentally prejudiced" by the "trial court's rulings," insofar as he was "unable to clearly demonstrate to the jury the inconsistent statements [given by Jessica and her son] to further prove his innocence," and that had he been given the opportunity to impeach these witnesses, the jury would have had "a legitimate reason to question the validity of their testimony." *Id.*

[7,8] Besides not mentioning Jessica's son in the section of his brief assigning errors, Bedford's alleged error is problematic in that it does not specifically identify which of the "trial court's rulings," *id.*, were erroneous. The district court made multiple rulings regarding trial counsel's impeachment of Jessica and her son; some objections were sustained, while others were overruled. Bedford provides no description of which particular ruling or rulings he claims violated his rights in this case. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the

error to be considered by an appellate court. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). It is not the duty of a court to scour the record in search of facts that might support a claim. *In re App. No. C-4973 of Skrdlant*, 305 Neb. 635, 942 N.W.2d 196 (2020). Bedford has not argued this assigned error with the required specificity, and we therefore do not address this argument further.

## 2. Failure to Instruct Jury on Self-Defense

A formal jury instruction conference took place on the morning of June 10, 2021, before the jury was seated for closing arguments. Bedford's trial counsel requested "the standard jury instruction on self-defense" as to count 3, third degree domestic assault, stemming from the October 5, 2019, incident; no copy of a proposed instruction is contained in our record. On appeal, Bedford claims the proposed instruction "was a correct statement of the law," as it was "drawn directly from Neb. Rev. Stat. § 28-1409 (2016) and NJI2d Crim. 7.1." Brief for appellant at 35. Ordinarily, the failure to include a proposed instruction would preclude our review, but because our consideration of this issue turns on the evidence rather than the wording of the instruction itself, we proceed to address it. Bedford claims that the district court erred in overruling his request for a self-defense jury instruction as to the October 2019 domestic assault offense.

Pursuant to § 28-323(1), a person commits third degree domestic assault if he or she "(a) [i]ntentionally and knowingly causes bodily injury to his or her intimate partner" or "(b) [t]hreatens an intimate partner with imminent bodily injury." Bedford points to his testimony that Jessica had pushed and pinned him against the bedroom door, preventing him from leaving the room. Bedford said that in response, he "didn't shove" Jessica, but "pushed her off of [him]," and that she tripped over a shoe and hit her face on the nearby plastic bed base. Trial counsel asserted that Bedford's testimony warranted

a self-defense instruction as to this incident. However, the district court agreed with the State's position at the jury instruction conference that the facts did not "rise to the level of needing the self-defense instruction."

On appeal, Bedford argues that his testimony regarding the October 2019 incident "satisfied the initial burden of a defendant to request a self-defense instruction." Brief for appellant at 36. He describes that "his initial shove of [Jessica] was necessary to protect himself after she cornered him and pushed him up against the wall." *Id.* Citing to *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997), he asserts that the district court improperly decided a factual issue for the jury by refusing his proposed instruction, and he notes that he needed only to produce "a slight amount of evidence" to warrant a self-defense instruction. Brief for appellant at 35.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Kinser, supra*. As noted above, to the extent the "standard jury instruction" requested by Bedford's trial counsel would have been NJI2d Crim. 7.1, Bedford's proposed instruction would have been a correct statement of the law. We therefore turn to the second factor articulated in *Kinser*, namely whether the tendered instruction was warranted by the evidence.

[9-12] Self-defense is a statutorily affirmative defense in Nebraska. *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009) (defendant has burden of going forward with evidence of self-defense, after which State has burden to prove defendant did not act in self-defense). In the context of a self-defense instruction, a trial court must instruct the jury on the issue of self-defense when there is any evidence adduced which raises a legally cognizable claim of self-defense. See *id.* As set forth in Neb. Rev. Stat. § 28-1409(1) (Reissue 2016),

the use of force against another person is justifiable "when the actor believes that such force is immediately necessary for the purpose of protecting himself [or herself] against the use of unlawful force by such other person." To successfully assert the claim of self-defense, one must have a both reasonable and good faith belief in the necessity of using force. *State v. Kinser, supra*. The force used in defense must also be justified under the circumstances. See *id.*

[13-15] A trial court is not required to give an instruction where there is insufficient evidence to prove the facts claimed; however, it is not the province of the trial court to decide factual issues even when it considers the evidence produced in support of one party's claim to be weak or doubtful. *Id.* It is only when the evidence does not support a legally cognizable claim of self-defense, or the evidence is so lacking in probative value as to constitute a failure of proof, that a trial court may properly refuse to instruct a jury on a defendant's theory of self-defense. *Id.* A defendant need only produce a slight amount of evidence to satisfy this initial burden of raising the issue of self-defense. *Id.* That this slight amount of evidence may ultimately be insufficient for the defendant to prevail on his or her claim of self-defense does not bear on whether a self-defense instruction should have been given by the trial court. See *id.*

[16] However, only where the jury could reasonably find that the defendant's use of force was justified should the trial court instruct the jury on self-defense. *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020). "It is not enough to merely show 'any evidence' of self-defense to support an instruction thereon. Instead, the defendant must show 'any evidence in support of a legally cognizable theory of self-defense.'" *Id.* at 843, 937 N.W.2d at 226 (quoting *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997)). Further, the Nebraska Supreme Court has interpreted § 28-1409 to mean that "to successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force

and the force used in defense must be immediately necessary and justified under the circumstances." *State v. Case*, 304 Neb. at 843, 937 N.W.2d at 226.

The State contends that the "evidence and testimony make clear that there was no established reasonable and good faith belief on the part of Bedford that force was immediately necessary nor justified during the October 5, 2019[,] assault." Brief for appellee at 43. The State argues that Bedford "has not articulated why shoving [Jessica] was 'necessary to protect himself'" and that Bedford failed to sufficiently establish a claim of self-defense, because "he did not testify as to the immediate threat posed by [Jessica], prior threats followed with physical harm, weapons held by [Jessica], injuries caused by [Jessica], or what he believed she intended to do if he did not make physical contact with her." *Id.*

However, we are not persuaded that Bedford failed to allege sufficient facts to warrant a jury instruction on self-defense. Bedford's testimony, as well as exhibit 7, indicated that during the incident on October 5, 2019, Jessica pushed Bedford against the bedroom door and prevented him from leaving the residence with physical force, and that Bedford thereafter "pushed [Jessica] off of [him]," causing her to fall and be injured. There was no evidence adduced that the force used by Bedford to push Jessica away was disproportionate to the force initially used by Jessica to "push[]" and "pin[]" Bedford to the bedroom door. Bedford's testimony and exhibit 7 also indicate that Jessica was angry and otherwise emotionally charged during this incident and that Bedford was simply attempting to leave the residence. From this evidence, Bedford has articulated a cognizable claim that he held a reasonable belief that the force used to push Jessica away was immediately necessary and justified to allow him to leave the residence.

The State points to evidence conflicting with Bedford's account that "strongly suggested that the physicality of the argument turned assault was more one-sided than Bedford claims and favored Bedford," brief for appellee at 44, but this

argument, as well as those previously described, only empha-
sizes the propriety of a self-defense instruction in this case.
That other evidence may have conflicted with or undermined
Bedford's account is a question for the jury to resolve, not to
be deprived by the district court's refusal to grant the proposed
instruction. See *State v. Kinser, supra* (questions of fact raised
by defendant's account that defendant acted in self-defense
were for jury to resolve).

Two separate bases in support of the conclusion that the
self-defense instruction was not warranted here are articulated
in the concurrence in part and in part dissent. The first is that
Bedford's failure to testify that his use of force was neces-
sary to protect himself against a perceived danger to himself
from Jessica resulted in a record which was insufficient to
support a self-defense instruction. The second basis is that the
self-defense instruction would conflict with Bedford's theory
of the case, that the injury was unintentional, and should
not be given in such situations. We will address those mat-
ters independently.

There is no dispute that Bedford did not explicitly testify
that his use of force to push Jessica away when she had him
"pinned" was necessary to protect himself against a perceived
danger. But as the Nebraska Supreme Court stated in *State v.
Graham*, 234 Neb. 275, 279, 450 N.W.2d 673, 676 (1990), the
general rule is:

> A defendant is entitled to have the jury instructed on
> his or her theory of defense if there is *any* evidence to
> support it. *State v. Clayburn*, 223 Neb. 333, 389 N.W.2d
> 314 (1986).
>
> [The defendant] did not testify. The trial court refused
> the self-defense instruction because it apparently believed
> that a defendant must testify in order to establish his or
> her good-faith belief that force was necessary. However,
> this is not the rule in this state. As expressed in *Clayburn*,
> it is necessary only that there be any evidence to support
> a theory of self-defense.

This case is certainly different from *Graham*, in that in this case, Bedford did testify and could have testified to his good faith belief that his use of force to push Jessica off him was necessary to protect himself. But *Graham* stands for the proposition that his failure to utter those specific words does not render his request for the instruction necessarily fatal. The issue becomes whether the evidence, offered without the specific expression of the good faith belief, is sufficient for a jury to reasonably find that the use of force by the defendant was justified. See *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997) (evidence necessary to raise affirmative defense may be adduced either by defendant's witnesses or in State's case in chief without necessity of defendant's presenting evidence). By his testimony, Bedford described that his use of force against Jessica was a result of her use of force against him; that is, her physically having him pinned, which resulted in his use of force to extricate himself. Based on the Nebraska Supreme Court's statement that a defendant need only adduce a slight amount of evidence to satisfy the initial burden of raising the issue of self-defense, we find this description by Bedford adequate to overcome that hurdle. As the Nebraska Supreme Court noted in *State v. Kinser*, 252 Neb. at 607, 567 N.W.2d at 292, "as a practical matter, a slight amount of evidence may not be enough to ultimately *prevail* on the defense of self-defense. A defendant is not required to plead and give notice of an affirmative defense of justification or self-defense." We believe Bedford's description of the events which took place during the October 2019 incident, coupled with the additional evidence presented at trial, was sufficient to create a factual question for the jury on whether his use of force was justified under the elements of the self-defense instruction. See *State v. Warren*, 9 Neb. App. 60, 608 N.W.2d 617 (2000) (defendant's claim of self-defense is question of fact for jury; jury, not trial court, must resolve multiple factual questions concerning whether defendant acted in self-defense within meaning of law).

Nor are we persuaded by the second argument in the concurrence in part and in part dissent that Bedford's statements that he did not intend to harm Jessica with his push was dispositive of the issue. In support of that proposition, we are directed to *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007), as well as *State v. Brow*n, 220 Neb. 849, 374 N.W.2d 28 (1985), and *State v. Canby*, 217 Neb. 461, 348 N.W.2d 900 (1984). In *Faust*, the Nebraska Supreme Court held that "when the defendant's theory of the case is that he or she did not commit the crime [or that the force toward the victim was accidental], the court risks confusing or misleading the jury" by tendering the self-defense instruction. 265 Neb. at 879, 660 N.W.2d at 874. But we find those cases to be distinguishable. In those cases, the defendant denied intentionally using force at all in connection with the charged crime. Here, Bedford's theory was that he intentionally used force to repel Jessica, but that he did not intend to injure her with the force he used and that the force he used was in response to the force that Jessica was applying to him. Under those circumstances, we do not find the self-defense instruction mutually exclusive of Bedford's theory that he intended no injury by his intentional use of force. We find that the evidence received at trial could have supported Bedford's theory of self-defense such that a self-defense instruction was warranted. In light of this evidence, the district court should have instructed the jury on self-defense as requested.

[17-19] However, our analysis does not end here. We must next determine whether Bedford was prejudiced by the court's refusal to so instruct the jury. Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party. *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019). Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the

error a guilty verdict surely would have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Id.* It is the duty of the trial judge to instruct the jury on the pertinent law of the case, whether requested to do so or not, and an instruction or instructions which by the omission of certain elements have the effect of withdrawing from the jury an essential issue or element in the case are prejudicially erroneous. *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997).

Bedford argues that he was prejudiced in this case because he "did not deny that he pushed [Jessica], but rather asserted that such actions were justified in self-defense. Without authority to consider self-defense, the jury was left with no choice but to find" Bedford guilty on count 3. Brief for appellant at 38.

While we note that the jury could have found that Bedford pushed Jessica without intentionally and knowingly causing her bodily injury or that Bedford did not threaten Jessica with imminent bodily injury, see § 28-323(1)(a) and (b), we agree that the foreclosure of the possibility for the jury to find that Bedford pushed Jessica in self-defense was not harmless error. See *State v. Kinser*, 252 Neb. at 609, 567 N.W.2d at 293 ("[t]he effect of the trial court's refusal to instruct the jury concerning [defendant's] claim of self-defense was to withdraw from the jury consideration of an essential issue in the case, that being the State's burden to prove that [defendant] did not act in self-defense"). Given the record in this case, we cannot say that the guilty verdict on count 3 was surely unattributable to the district court's failure to instruct the jury on self-defense. Accordingly, we find that the district court's failure to instruct the jury on Bedford's self-defense claim as related to count 3 constituted reversible error.

### 3. DOUBLE JEOPARDY AND SUFFICIENCY OF EVIDENCE FOR COUNT 3

[20,21] Upon finding reversible error in a criminal trial, an appellate court must determine whether the total evidence

admitted by the district court, erroneously or not, was sufficient to sustain a guilty verdict. *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015). If it was not, then double jeopardy forbids a remand for a new trial. *Id.* Accordingly, having found reversible error in the district court's failure to instruct the jury on Bedford's self-defense claim as related to count 3, we must determine whether the evidence admitted was sufficient to sustain Bedford's conviction for third degree domestic assault on October 5, 2019.

As alleged in the amended information and pursuant to statute, a person commits third degree domestic assault if he or she "[i]ntentionally and knowingly causes bodily injury to his or her intimate partner," § 28-323(1)(a), or "[t]hreatens an intimate partner with imminent bodily injury," § 28-323(1)(b). Evidence introduced at trial indicated that Bedford and Jessica began to argue in their bedroom on October 5, 2019, and this argument escalated into a physical confrontation. Jessica's son also testified that he heard a "big boom" from the bedroom as well as Jessica "crying" and that he believed it necessary to get help from the police. Upon arriving, officers photographed Jessica's injuries, and it was confirmed that these injuries did not exist prior to the argument. We also note the testimony of the officers indicated that Bedford was attempting to elude law enforcement. While there is conflicting evidence regarding this incident, it is not the role of this court to resolve such conflicts. See *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). Rather, we view the evidence in the light most favorable to the prosecution. See *id.* We therefore find that the evidence was sufficient to sustain Bedford's conviction on count 3, and double jeopardy does not preclude a new trial concerning count 3.

[22] Accordingly, we reverse Bedford's conviction and sentence on count 3 and remand the cause for new trial. This holding is limited solely to count 3. See *Beyl v. State*, 165 Neb. 260, 85 N.W.2d 653 (1957) (appellate court may reverse criminal judgment in part and affirm judgment in part where

reversed conviction is separate and distinct from remaining convictions).

## 4. Sufficiency of Evidence for Remaining Convictions

Bedford claims the State failed to meet its burden of proof as to all offenses charged; however, other than arguing that he presented an alibi defense "through the testimony of multiple witnesses" for the April 2020 incident, he does not specifically address the failure of proof as to each conviction. Brief for appellant at 34. Nevertheless, we will consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *State v. Figures, supra*. Having previously addressed count 3, we discuss only the remaining counts here.

### (a) Counts 1 and 2

Bedford was convicted of one count of assault by strangulation, count 1, and one count of third degree domestic assault, count 2, in connection with the incident on April 4, 2020. As noted, he argues only that he "presented an alibi defense through the testimony of multiple witnesses [who] testified that he had been at their house the day of" the April 4 incident. Brief for appellant at 34.

Under § 28-310.01(1), a person commits an assault by strangulation if the person knowingly and intentionally "[i]mpedes the normal breathing or circulation of the blood of another person by applying pressure on the throat or neck of the other person" or "[i]mpedes the normal breathing of another person by covering the mouth and nose of the person." Pursuant to § 28-323(1), a person commits third degree domestic assault if he or she "(a) [i]ntentionally and knowingly causes bodily injury to his or her intimate partner" or "(b) [t]hreatens an intimate partner with imminent bodily injury."

At trial, Jessica and her grandmother stated that they observed Bedford come to the house on April 4, 2020. Jessica testified that Bedford pulled her into the garage and that they began to argue. This argument escalated, and Bedford began to "choke[]" Jessica before she fell to the ground due to lack of air. Jessica then described that Bedford began to strike her while she was still on the ground and that he left at some point thereafter. After her grandmother called 911, law enforcement photographed injuries to Jessica's neck and chest area that, according to a licensed registered nurse who viewed the photographs, were "consistent with strangulation." Although Bedford identifies that his account of the April 4 incident conflicts with Jessica's, such conflicts are to be resolved by the jury. See *State v. Figures, supra*. Viewing the evidence in the light most favorable to the State, we find that there was sufficient evidence to sustain Bedford's convictions for assault by strangulation and third degree domestic assault in connection with the April 2020 incident.

### (b) Count 5

[23] Bedford was convicted of tampering with a witness. Pursuant to § 28-919(1):

> A person commits the offense of tampering with a witness or informant if, believing that an official proceeding or investigation of a criminal or civil matter is pending or about to be instituted, he or she attempts to induce or otherwise cause a witness or informant to:
>
> (a) Testify or inform falsely;
>
> (b) Withhold any testimony, information, document, or thing;
>
> (c) Elude legal process summoning him or her to testify or supply evidence; or
>
> (d) Absent himself or herself from any proceeding or investigation to which he or she has been legally summoned.

A defendant's reasons for attempting to induce a witness to commit any of the acts enumerated in § 28-919(1) are not

relevant. *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020).

On October 7, 2019, a phone call between Bedford and Jessica was recorded while Bedford was in jail. This phone call occurred despite Bedford's prohibition from contacting Jessica due to his arrest. A recording of the call was received at trial, and in it, Bedford instructed Jessica "not [to] come to court" if she were subpoenaed. Bedford also told Jessica that he "needed her to stay focused" and to "[m]ake sure [she] stays on this shit," and according to her testimony, Jessica "[w]hole-heartedly" believed that Bedford was telling her to "continue to work on getting this case dropped." We also note Jessica's testimony indicating that she wrote exhibit 7 "[b]ecause [Bedford] asked [her] to" in order to help him get the charges "dropped." From this record, a rational fact finder could find that the State proved the elements of tampering with a witness beyond reasonable doubt. Accordingly, we find the evidence sufficient to sustain Bedford's conviction.

## 5. INEFFECTIVE ASSISTANCE OF COUNSEL

[24] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). Bedford's counsel on direct appeal is different from his trial counsel.

[25,26] Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit, or in the rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial. *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019). An ineffective assistance of counsel claim made on direct appeal can

be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *Id.*

[27-29] Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome.

With these governing principles in mind, we turn now to address Bedford's claims of ineffective assistance of counsel.

(a) Failure to File Motion for Discharge
on Speedy Trial Grounds

Bedford alleges that his trial counsel was ineffective for failing to file a motion for absolute discharge on speedy trial grounds. He argues that "trial counsel did not protect his right to a speedy trial by failing to file and litigate a motion for discharge for violation of his speedy trial rights." Brief for appellant at 29. He then references the federal and state Constitutions as guaranteeing the right to a speedy trial and cites to Neb. Rev. Stat. § 29-1207(1) (Reissue 2016) for the requirement that a defendant "shall be brought to trial within six months."

[30] When a defendant alleges he or she was prejudiced by trial counsel's failure to properly assert the defendant's speedy trial rights, the court must consider the merits of the defendant's speedy trial rights under *Strickland*. *State v. Collins*, 299

Neb. 160, 907 N.W.2d 721 (2018). Only if a motion would have resulted in the defendant's absolute discharge, thus barring a later trial and conviction, could the failure to move for discharge be deemed ineffective assistance. *Id.*

### (i) Statutory Speedy Trial Rights

To calculate the deadline for trial for speedy trial purposes, a court must exclude the day the State filed the information, count forward 6 months, back up 1 day, and then add any time excluded under § 29-1207(4). The original information was filed August 13, 2020. Therefore, the speedy trial deadline before adding any excluded time was February 13, 2021.

We note that there were three continuances ordered during this case. In an order entered on December 2, 2020, the district court first continued trial until February 1, 2021, as a result of the COVID-19 pandemic and related restrictions placed on the Lancaster County District Court. In an order entered on January 25, trial was again continued until April 5 due to the COVID-19 pandemic. In an order entered on March 25, the court granted the State's motion to continue, finding good cause existed due to the State's "call[ing] off [of] witnesses" in anticipation of a plea. Trial thereafter commenced on June 7.

Section 29-1207(4)(c) excludes certain periods of delay "resulting from a continuance granted at the request of the prosecuting attorney," and § 29-1207(4)(f) allows the exclusion of "[o]ther periods of delay not specifically enumerated in this section, but only if the court finds that they are for good cause."

On appeal, Bedford does not contest the propriety of these continuances or otherwise assert that the time periods should have been included. He simply asserts that he had "been incarcerated for over a year" and "the matter was continued three times over a span of seven months." Brief for appellant at 30. We note that the Nebraska Supreme Court has held in several cases that the COVID-19 pandemic provided sufficiently good

cause to continue trial. See, e.g., *State v. Abernathy*, 310 Neb. 880, 969 N.W.2d 871 (2022); *State v. Gnanaprakasam*, 310 Neb. 519, 967 N.W.2d 89 (2021); *State v. Brown*, 310 Neb. 224, 964 N.W.2d 682 (2021). We further conclude, as the district court did, that the surprise placed upon the State by the changed plea also constituted good cause to continue trial. All such periods were therefore excludable under § 29-1207.

After adding the excluded time, the deadline for trial was August 19, 2021. Trial commenced on June 7. Accordingly, trial counsel could not have been ineffective in failing to file a motion to discharge on statutory speedy trial grounds, as trial commenced prior to the statutory deadline.

### (ii) Constitutional Speedy Trial Rights

[31] Determining whether a defendant's constitutional right to a speedy trial has been violated requires a balancing test in which the courts must approach each case on an ad hoc basis. *State v. Brooks*, 285 Neb. 640, 828 N.W.2d 496 (2013). That test involves consideration of four factors: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. *State v. Brown, supra*. None of these four factors standing alone is a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial. *Id.* Rather, the factors are related and must be considered together with other circumstances as may be relevant. *Id.*

[32] Again, in support of this assigned error, Bedford refers only to his incarceration and the three continuances granted over 7 months as described above. As noted previously, trial commenced on June 7, 2021, which was before the speedy trial deadline. The delays in this case were due to the COVID-19 pandemic, as well as Bedford's decision to enter a plea of not guilty after the State was informed that the matter would not progress to trial. We have already found these delays to be for good cause. On our examination of the record, we further find that Bedford has not shown prejudice that would have

warranted discharge. See *State v. Betancourt-Garcia*, 295 Neb. 170, 887 N.W.2d 296 (2016) (in analyzing prejudice factor, there are three aspects: (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern of defendant, and (3) limiting possibility that defense will be impaired by dimming memories and loss of exculpatory evidence), *abrogated on other grounds, State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020). Although Bedford was incarcerated for a substantial period of time and expressed concern regarding his incarceration, nothing in the record indicated that Bedford's defense was impaired, given the substantial detail with which Bedford and his witnesses testified. We conclude that Bedford's constitutional speedy trial rights were not violated by the delays in this case. Accordingly, counsel could not have been ineffective in not filing a motion to discharge on speedy trial grounds that would have failed. See *State v. Collins*, 299 Neb. 160, 907 N.W.2d 721 (2018).

### (b) Failure to Present Evidence

Bedford contends that trial counsel was ineffective in failing to "present evidence . . . in [counsel's] possession at trial," including "emails and text messages" from Jessica. Brief for appellant at 31. He asserts that "[t]hese emails and text messages could have been used to impeach and . . . challenge" Jessica's testimony. *Id.* We conclude that this claim of deficient performance has not been sufficiently alleged.

[33,34] When making an ineffective assistance of counsel claim on direct appeal, allegations of prejudice are not required. *State v. Ash*, 293 Neb. 583, 878 N.W.2d 569 (2016). However, a defendant must make specific allegations of the conduct that he or she claims constitutes deficient performance. *Id*. Appellate counsel must present the claim with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought

before the appellate court. *Id*. General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review. *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

Bedford offers this court no further description of which emails or text messages are applicable; nor does he provide any indication of their contents or how they could have been used to impeach Jessica's testimony. It is not sufficient to simply allege that some messages were in counsel's possession that may or may not have been relevant to the impeachment of Jessica's testimony. See, *State v. Hill*, 298 Neb. 675, 699, 905 N.W.2d 668, 686 (2018) (ineffective assistance of trial counsel claim regarding counsel's failure to depose "'numerous other police officers'" without specifically alleging what testimony of these witnesses would have been is not sufficient allegation of deficient performance for purpose of preserving claim for postconviction review); *State v. Ash, supra* (ineffective assistance of trial counsel claim alleging deficient performance based merely on trial counsel's possession of psychiatric evaluation which was not offered or used at trial without further explanation as to what it contained, how it could have been used, or what it might have been offered to prove is not stated with sufficient particularity to preserve claim for postconviction review).

Accordingly, we find that Bedford has not alleged deficient performance with sufficient particularity, and therefore, this claim is not preserved for postconviction review.

### (c) Failure to Advise of Habitual Criminal Enhancement

Bedford claims that trial counsel was ineffective in failing to properly advise him that "he could be facing two separate and potentially consecutive habitual criminal sentences" on counts 1 and 5. Brief for appellant at 31. He argues that he was prejudiced because he was not afforded "all the information to

make sound decisions about how to proceed with his case." *Id.* However, the district court imposed concurrent and identical sentences for counts 1 and 5, and only these two charges were subject to enhancement. Bedford further does not describe how his approach to the trial would have changed with the knowledge that count 1 was also subject to further enhancement. In light of the fact that Bedford was not actually impacted by the two "potentially consecutive habitual criminal sentences," *id.*, we find that he cannot show prejudice. This claim of ineffective assistance therefore fails.

### (d) Failure to Select Fair and Impartial Jury

Bedford asserts that trial counsel was ineffective in failing to select an impartial jury. He notes that "[m]ore than half of the jury was composed of females," which composition he claims caused him prejudice because this was a case where "the victim was female . . . and the alleged perpetrator was a male." *Id.* at 32. He also asserts that many of the jurors reported being teachers by profession and that, as one male juror described, teachers "'see things'" regarding domestic violence. *Id.* Bedford further points out that many of the jurors had personal experience with domestic abuse as both victims and third parties to abusive relationships.

[35-37] When reviewing claims of alleged ineffective assistance of counsel, an appellate court affords trial counsel due deference to formulate trial strategy and tactics. *State v. Torres*, 295 Neb. 830, 894 N.W.2d 191 (2017). There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions. *Id.* Even if found unreasonable, the error justifies setting aside the judgment only if there was prejudice. See *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). We first note that the prospective jury pool was predominantly female, and three male jurors were selected to serve on the jury. Further, although the record does not conclusively show

which of the prospective jurors were struck via the defense's peremptory strikes, several prospective jurors who fell within the categories highlighted by Bedford on appeal as problematic were struck from the jury pool. A defendant is constitutionally guaranteed a jury that is fair and impartial, but a defendant is not guaranteed a jury comprising only particular jurors. See *State v. Huff*, 25 Neb. App. 219, 904 N.W.2d 281 (2017). The prospective jurors who felt that they would have difficulties being impartial in this case due to their prior experiences were dismissed, and those selected jurors who had described experiences with domestic violence and abusive relationships affirmed that they could be impartial in this matter. Even if trial counsel's strategy in jury selection had been unreasonable, we find that the record refutes Bedford's allegations that he was prejudiced by a biased jury. Accordingly, this ineffective assistance claim fails.

(e) Failure to File Motion to Sever

Bedford claims that trial counsel was ineffective in failing to file a motion to sever the counts listed in the information. He argues that "[p]ermitting these counts to be tried together impermissibly tainted the jury's perception . . . and [the jurors'] determination of guilt" such that "he did not receive a fair trial on each separate count in this case." Brief for appellant at 33.

[38-41] Neb. Rev. Stat. § 29-2002 (Reissue 2016) provides for the joinder and severance of charges in a criminal case. In pertinent part, § 29-2002 provides:

(1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

. . . .

(3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint[,] . . . the court may order an election for separate trials of counts, indictments, informations, or complaints . . . or provide whatever other relief justice requires.

Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related to be joinable and (2) whether the joinder was prejudicial to the defendant. *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020). There is a strong presumption against severing properly joined counts. *Id.* Joined charges do not usually result in prejudice if the evidence is sufficiently simple and distinct for the jury to easily separate evidence of the charges during deliberations. *Id.* Further, prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge. *Id.*

Bedford does not specify which counts in the amended information should have been severed. However, we first observe that the counts relating to the three incidents of assault all involved conflict between Bedford and Jessica in similar circumstances in that they escalated from arguments between the two, constituting a pattern of similar conduct. With respect to the witness tampering count, the evidence of this charge would have been admissible as evidence of consciousness of guilt in a separate trial on his domestic assault charges, as he explicitly instructed Jessica not to come to court if she were subpoenaed after his arrest following the October 2019 assault. See *id.* (evidence of defendant's phone calls to witnesses would have been admissible in separate trial as evidence of defendant's conscious guilt that crime had been committed).

Further, we find that the evidence in this case was sufficiently simple and distinct for the jury to separate the evidence corresponding to each count during deliberations. Each incident in this matter was distinct, and the jury was instructed to consider each incident individually. That the jury found

Bedford not guilty on count 4 (relating to the July 2019 assault) is an indication that the jury in fact considered each count individually. We therefore conclude that Bedford was not prejudiced by trial counsel's failure to file a motion to sever, as any such motion would have failed. Accordingly, this ineffective assistance claim fails.

## VI. CONCLUSION

For the reasons set forth above, we find that the district court erred in failing to instruct the jury on Bedford's claim of self-defense as to count 3. As for the remaining counts, the evidence was sufficient to sustain Bedford's convictions on each count. We affirm Bedford's convictions and sentences as to counts 1, 2, and 5; however, we reverse his conviction and sentence as to count 3 and remand the cause for a new trial solely on count 3.

We further find that the following claims by Bedford that his trial counsel was ineffective fail: failing to file a motion for discharge on speedy trial grounds, failing to advise Bedford that counts 1 and 5 were both subject to habitual criminal enhancement, failing to select a fair and impartial jury, and failing to file a motion to sever the counts in the amended information. Bedford's ineffective assistance of counsel claim regarding the failure of trial counsel to present emails and text messages in his possession was not alleged with the required specificity and is not preserved for postconviction review.

Affirmed in part, and in part reversed
and remanded for a new trial.

Bishop, Judge, concurring in part, and in part dissenting.

I concur in all aspects of the majority opinion, except for that portion reversing the conviction and remanding the cause for a new trial as to count 3 (the October 2019 incident) based on the district court's failure to instruct the jury on self-defense as to that count. In my opinion, the trial court

properly concluded that a self-defense instruction was not supported by the evidence; I would have affirmed Bedford's convictions.

I agree with the State that the "evidence and testimony make clear that there was no established reasonable and good faith belief on the part of Bedford that force was immediately necessary nor justified during the October 5, 2019[,] assault." Brief for appellee at 43. The State argues that Bedford "has not articulated why shoving [Jessica] was 'necessary to protect himself'" and that Bedford failed to sufficiently establish a claim of self-defense, because "he did not testify as to the immediate threat posed by [Jessica], prior threats followed with physical harm, weapons held by [Jessica], injuries caused by [Jessica], or what he believed she intended to do if he did not make physical contact with her." *Id.* I agree that Bedford failed to put forward any evidence to suggest he "pushed [Jessica] off of [him]" in an effort to protect himself from any unlawful force being used by Jessica.

Only where the jury could reasonably find that the defendant's use of force was justified should the trial court instruct the jury on self-defense. *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020). "It is not enough to merely show 'any evidence' of self-defense to support an instruction thereon. Instead, the defendant must show 'any evidence in support of a legally cognizable theory of self-defense.'" *Id.* at 843, 937 N.W.2d at 226 (quoting *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997)). Further, the Nebraska Supreme Court has interpreted Neb. Rev. Stat. § 28-1409 (Reissue 2016) to mean that "to successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be immediately necessary and justified under the circumstances." *State v. Case*, 304 Neb. at 843, 937 N.W.2d at 226.

The majority determines that Bedford articulated a cognizable theory of self-defense because "he held a reasonable belief that the force used to push Jessica away was immediately

necessary and justified to allow him to leave the residence." However, in my opinion, these facts are insufficient to establish any belief by Bedford that the force used was "immediately necessary for the purpose of protecting himself," as required by § 28-1409(1). Bedford never testified, nor did any other evidence indicate, that Bedford pushed Jessica "off of [him]" to protect himself. Rather, he testified he was packing his possessions when Jessica pushed him into the bedroom door to stop him from leaving and said he "wasn't going anywhere." Bedford claimed that he then tried to continue packing but that Jessica pushed him and pinned him against the door, at which point he "didn't shove her," but he "pushed [Jessica] off of [him]" and she tripped over one of his shoes and hit her face on the nearby "bed base." By his own testimony, Bedford was able to return to attempting to pack after Jessica allegedly pushed him into the bedroom door initially. Notably, Bedford testified that when Jessica fell, "I helped her up. I felt that was my fault. Even so, I didn't mean to hurt her."

Bedford did not produce any evidence in support of a legally cognizable theory of self-defense based upon his own testimony. Even disregarding any conflicting evidence regarding the October 2019 incident, Bedford's own testimony does not suggest that he pushed Jessica to protect himself against a perceived danger to himself from Jessica; rather, he attempted to persuade the jury that Jessica's injury was simply the result of her tripping and falling when he pushed her "off of" him. By claiming that Jessica's injury from her fall was accidental and not intentionally caused by him, Bedford placed evidence before the jury that he could not have committed third degree domestic assault, since he did not "[i]ntentionally and knowingly cause[] bodily injury to his . . . intimate partner." Neb. Rev. Stat. § 28-323(1)(a) (Reissue 2016). Bedford even testified that he "believe[d] that [he] apologized to [Jessica] again" while he was being arrested. Bedford never testified that he pushed Jessica because such force was immediately necessary and justified for the purpose of protecting himself

against the use of unlawful force by Jessica. The lack of evidence that Bedford believed such force to be necessary and justified to protect himself supports the district court's refusal to tender Bedford's proposed self-defense instruction.

Further, as noted in the majority's opinion, self-defense is a statutorily affirmative defense, meaning Bedford had the burden of going forward with evidence of self-defense, after which the State would have had the burden to prove Bedford did not act in self-defense. See *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009). But how could the State meet a burden of proving Bedford did not act in self-defense when Bedford made no effort to put forth any evidence of self-defense? Bedford's theory of defense was that he did not commit the crime of third degree domestic assault because he did not intend to cause bodily injury to Jessica; he admitted to pushing her, but testified that her tripping over one of his shoes and hitting her face on the nearby "bed base" was accidental. Bedford did not admit to harming Jessica on the basis that his action was justified to protect himself; rather, he claimed her injury was unintended. The Nebraska Supreme Court has held that

> when the defendant makes no effort to meet the initial burden of proof to prove self-defense and when self-defense is not the defendant's theory of the case, a self-defense instruction is not warranted. A theory of self-defense necessarily involves an inference or admission that the defendant harmed the victim, but that the defendant's acts were justified. By giving a self-defense instruction when the defendant's theory of the case is that he or she did not commit the crime, the court risks confusing or misleading the jury.

*State v. Faust*, 265 Neb. 845, 879, 660 N.W.2d 844, 874 (2003), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007). See, also, *State v. Brown*, 220 Neb. 849, 374 N.W.2d 28 (1985) (no error in failing to instruct on self-defense, first degree assault conviction affirmed; court

distinguished between intentionally causing bodily injury and defense theory of accidental injury); *State v. Canby*, 217 Neb. 461, 348 N.W.2d 900 (1984) (no error in refusal by trial court to give self-defense instruction when defendant's testimony was not that she used justifiable force, but, rather, that she accidentally and unintentionally, or without purpose, harmed victim); *State v. Staats*, No. 2019CA00181, 2021 WL 1502535 at *7 (Ohio App. Apr. 16, 2021) (no plain error in trial court's failure to instruct on self-defense, domestic violence conviction affirmed; defendant not entitled to self-defense jury instruction when defense at trial through defendant's own testimony was that his conduct was justified because victim "'got in his face,'" that he did not cause victim's bruises, and that he was not in fear of bodily injury but "merely wanted to stop her 'from getting in his face'"); *State v. Green*, No. M2019-02197-CCA-R3-CD, 2021 WL 1186413 at *6 (Tenn. Crim. App. Mar. 30, 2021) (trial court properly refused to instruct jury on self-defense; aggravated assault and domestic assault convictions affirmed; defendant's testimony was that victim hit his head with her fist, would not let him out of bedroom, was barricading door, and was pushing and taunting him as he made his way to den and that he at most "tried to push by" victim to get to front door, "not that he pushed her to defend himself from her"; and when defendant denies inflicting any injury, he is not entitled to claim self-defense).

Based on the evidence presented, including Bedford's own testimony and without regard to any conflicting evidence, I conclude there was no evidence to support a legally cognizable theory of self-defense. I find no error in the trial court's refusal to instruct on self-defense when Bedford's own testimony was not that he used justifiable force, but, rather, that he accidentally and unintentionally, or without purpose, harmed Jessica. See *State v. Canby, supra*.