IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. BRADBURY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CASSANDRA L. BRADBURY, APPELLANT.

Filed September 26, 2023.    No. A-22-641.

Appeal from the District Court for Lancaster County: DARLA S. IDEUS, Judge. Affirmed.

Kristi J. Egger, Lancaster County Public Defender, and Shawn Elliott for appellant.

Michael T. Hilgers, Attorney General, Melissa R. Vincent, and Braden Dvorak, Senior Certified Law Student, for appellee.

BISHOP, ARTERBURN, and WELCH, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Cassandra L. Bradbury was convicted by a jury of possession of a controlled substance (methamphetamine) and was thereafter sentenced by the district court to two years of probation. On appeal, Bradbury asserts that the district court erred in denying her motion to suppress both the statements she made to law enforcement and the evidence obtained by officers during a search of her bedroom. She also asserts that the court erred in allowing the State to present certain evidence during her testimony and that there was insufficient evidence to support her conviction. For the reasons set forth below, we affirm.

## II. BACKGROUND

On July 1, 2021, the State filed an information charging Bradbury with possession of a controlled substance (methamphetamine), in violation of Neb. Rev. Stat. § 28-416(3) (Cum. Supp.

2022), a Class IV felony. The charge against Bradbury stems from a search of her apartment which occurred on January 12, 2021.

The sole law enforcement officer to testify both at a hearing on Bradbury's motion to suppress and at trial was Investigator Andrew Barksdale of the Lincoln Police Department. Barksdale testified that during the evening hours of January 12, 2021, a confidential informant working for the Lincoln Police Department purchased 6.8 grams of methamphetamine from a local drug dealer named Babe Sipes. The purchase was made outside of a residence on North 52nd Street in Lincoln. During this drug deal, Sipes mentioned to the confidential informant that he was preparing to leave town in a couple of hours. Because there was an active warrant for Sipes' arrest which the police wanted to serve before he left town, Barksdale, a member of the narcotics task force, and other law enforcement officers, began to conduct surveillance of the residence where the confidential informant had purchased methamphetamine from Sipes. The officers at the scene were wearing plain clothes, but had their badges clearly displayed.

While surveilling the residence, two men walked from the residence toward the street. Believing that one of the men might be Sipes, officers approached the men. They learned that neither of the two men was Sipes. After officers approached these two men, they became concerned that Sipes might now know that they were outside waiting for him. One of the officers approached the front door of the residence and spoke with an occupant. This occupant gave the officers permission to enter the basement of the residence to look for Sipes.

Barksdale and two other officers stood on the landing of the basement stairs. They called down the stairs, identifying themselves as police officers, and asking that Sipes come upstairs because they had a warrant for his arrest. At this time, the officers had their guns drawn and were holding a ballistic shield in front of them.

The first person to come up the stairs from the basement was Bradbury. When Bradbury approached the officers, they continued to point their guns down the stairs in her direction, but they did not place her into custody or put handcuffs on her, as she was not the target of their investigation. Bradbury exited the residence and went to the driveway, where she either stood or sat, while the officers continued to call downstairs for Sipes. No one told Bradbury that she was not free to leave the scene.

The second person to exit the basement was Sipes. He was arrested without incident. Finally, Brian Ems exited the basement. He was also arrested because he had an active warrant for his arrest.

After Sipes and Ems were taken into custody, Barksdale approached Bradbury, who was one of the residents of the basement apartment. Barksdale asked Bradbury if he could go down to the basement to retrieve any belongings that Sipes may have left there and to look for any large quantities of methamphetamine that Sipes may have hidden within the apartment. Bradbury consented to Barksdale going into the basement to retrieve anything that Sipes, who was not a resident, may have left there. Upon searching the common area of the apartment, Barksdale located an orange back pack believed to belong to Sipes. Inside the back pack was a small digital scale. Also in the common area, Barksdale located a "marijuana bong" on a table.

Barksdale approached Bradbury again, asking her permission to walk through her bedroom to ensure that there were not any narcotics there. Barksdale indicated that he was not necessarily looking for anything of Bradbury's, he was still focused on finding any large quantities of

methamphetamine that Sipes may have left behind. According to Barksdale, Bradbury consented to a search of her bedroom. Barksdale and Bradbury entered the room together. Initially, Barksdale asked Bradbury's permission to search certain items within the bedroom. Then, he asked Bradbury if there was anything illegal in the room and where it would be. According to Barksdale, Bradbury immediately drew his attention, either verbally or nonverbally, to a box on the dresser. Bradbury then opened the box and Barksdale was able to observe a stem from a glass pipe that contained what appeared to be methamphetamine residue. Bradbury told Barksdale that everyone in the house used the pipe to smoke.

Barksdale also observed a baggie with what appeared to be methamphetamine residue inside. This baggie was found in plain view on a nightstand next to the bed. Bradbury also gave him a marijuana pipe that had been in her bedroom. Bradbury was placed into custody.

Prior to trial, Bradbury filed a motion to suppress. In the motion, Bradbury first asked the district court to "suppress all evidence seized from [Bradbury], including, but not limited to, any visual and auditory observations made by the officers of the Lincoln Police Department for the reason that the officers lacked probable cause to seize and hold [Bradbury]." Bradbury also asked the district court to enter "an order suppressing as evidence any and all pre-trial admissions or statements made by [Bradbury] to any law enforcement personnel, for the reason that such statements were not made and rights were not waived knowingly, intelligently, and voluntarily."

A hearing was held on Bradbury's motion on January 6, 2022. At the start of the hearing, Bradbury's counsel indicated that the primary focus of the motion to suppress was to address whether Bradbury was in custody when she was asked to consent to a search of the basement apartment and when she was otherwise questioned by Barksdale. "Long story short the issue that we're essentially attempting to address here is the fact that . . . Bradbury was not read her Miranda rights, although she was in custody and clearly interrogation was happening." Counsel's argument at the motion to suppress hearing was that Barksdale interrogated Bradbury when he asked her if she had anything illegal in her bedroom and that, at the time of that interrogation, Bradbury was in custody:

> While downstairs, it's my understanding that Officer Barksdale having not read her Miranda rights, said something to the effect . . . to Ms. Bradbury if you had anything illegal down here, where would it be. That question I believe constitutes interrogation, at which point and time Ms. Bradbury allegedly went to a box or something on the dresser, opened it up and presented what is allegedly a pipe that had some sort [of] residue or tested positive on a pretest for some sort of methamphetamine.
>
> I believe the circumstance today will show that this was clearly custodial. That clearly [is] a question that a reasonable person believes could illicit incriminating information [and] counts as interrogation. Such a question was asked without reading Miranda rights. So therefore, we're asking the Court to suppress any results of that interrogation, and therefore the evidence that was produced as a part of that interrogation.

Barksdale was the sole witness called by either party at the suppression hearing and testified as detailed above. After the hearing, the district court entered an order overruling Bradbury's motion to suppress. The court found,

Considering the totality of the circumstances, [Bradbury] was not in custody when she made the statements in question. When [Bradbury] exited the basement, she passed by three police officers at least two with their guns drawn. It was clear that the officers were at the house looking for Sipes. [Bradbury] was not restrained or placed under arrest when she exited the house. She was allowed to freely pass by the officers after which she went to the driveway. She was not told she was not free to leave. She was not placed in handcuffs. After Sipes and Ems were arrested, guns were no longer drawn and Investigator Barksdale approached [Bradbury] in the driveway. [Bradbury] was not in custody when she voluntarily consented to the search or made statements to Investigator Barksdale in the basement.

Trial was held on June 16 and 17, 2022. At the trial, Barksdale again testified about the events of January 12, 2021. During his testimony, Bradbury's counsel objected to the admission of any statements Bradbury made to Barksdale, as raised in the motion to suppress:

I'm just going to renew my objection as to the motion to suppress previously. I just don't want to get into statements that I believe I tried suppressing based on the fact that she was in custody on the Fifth Amendment which was the allegation in the motion to suppress. I just want to renew that at this time. If that's overruled ask for an on-going objection as to all of her statements made from this point on.

The district court overruled the objection, but permitted counsel to have a standing objection to the admission of any statement Bradbury made to Barksdale.

At trial, the State also called Jake Oshll to testify. Oshll is a chemist at the Nebraska State Patrol Crime Laboratory. He conducted testing on both the glass pipe stem and the baggie found in Bradbury's bedroom. Each of these items tested positive for methamphetamine.

After the State rested, Bradbury called Ems to testify. In January 2021, Ems resided with Bradbury and Daniel Wilson in the basement apartment of the residence on North 52nd Street. Bradbury is the mother of Ems' two adult children. Wilson is Ems' best friend. Ems explained that even though he shared children with Bradbury, at present they were just friends. In January 2021, Bradbury was in a romantic relationship with Wilson. Ems testified that Sipes did not live in the basement apartment, but he was friends with Wilson, so Sipes was visiting on January 12. Ems denied that anyone who lived in the apartment was purchasing drugs from Sipes.

On the evening of January 12, 2021, Ems testified that he was in the living room of the apartment with Sipes, when they heard a commotion coming from upstairs near the front door of the residence. Upon hearing the noise, Sipes jumped up from his seat and immediately attempted to push ceiling tiles up, as if he was trying to hide something. When Sipes could not get the ceiling tiles to move, Ems observed him go into the bedroom Bradbury and Wilson share, where Bradbury was sleeping. Sipes then moved into the bathroom area and the laundry area, before following Ems into his bedroom. Ems observed Sipes to be rustling around in some storage containers. At this point, they heard the police announce their presence from the top of the stairs. When Ems heard his own name called, he went upstairs where he was handcuffed and arrested for an outstanding warrant. Ems testified that he did not tell police about Sipes' behavior immediately prior to his arrest because the police never asked him about Sipes.

- 4 -

Bradbury testified in her own defense. Her account of the events of January 12, 2021, differed from that of Barksdale. She testified that earlier in the day, Sipes was at the apartment visiting. However, she never saw him with any drugs. She denied that she purchased drugs from Sipes and denied using any narcotics. In fact, Bradbury initially testified that no one in the basement apartment used drugs. During the State's cross-examination, she did admit that she had seen Wilson and Ems smoking marijuana in the apartment. Bradbury also admitted that she was aware that Sipes had a history of being involved with narcotics.

Bradbury testified that she went to bed early on the evening of January 12, 2021. She was later awoken by a commotion and exited her bedroom to see what was happening. At that point, the police officers at the top of the stairs ordered her to exit the apartment. When she reached the top of the stairs, she observed three officers with their guns drawn. Barksdale grabbed her by the arm and "yanked" her out the door. She was ordered to go sit in the driveway, but was not put in handcuffs. Barksdale asked her about who lived in the basement apartment, and whether there was anyone else down there at that time. She responded that she had not seen anyone else in the basement when she came up and denied seeing Sipes there after being woken up by the commotion. She told Barksdale that she, Wilson, and Ems lived in the basement. Bradbury described herself as being visibly upset during this questioning.

Bradbury testified that she did not consent to Barksdale searching the apartment. She told him that she would accompany him downstairs so that he could retrieve Sipes' belongings from the common area. But, once they were downstairs, another officer took Sipes' bags and Barksdale asked her if he could search the remainder of the apartment. She told him that her name was not on the lease and she was not sure if she could provide such consent. According to Bradbury, Barksdale then asked her which bedroom was hers. When she gestured toward her room, Barksdale "sprinted down the hallway" to the room. When she followed him, Barksdale asked her permission to search the room. She declined, telling him that she was not sure she could provide such permission since she shared the room with Wilson. Despite her response, Barksdale began searching the room. At one point during the search, he asked "if she had anything illegal in the room, where would it be located at." Bradbury responded that she did not have anything illegal.

Bradbury testified that during Barksdale's search, he opened a box on her dresser and pulled out a "broken glass piece." Bradbury testified that she had never seen this item before and had not ever used it to smoke methamphetamine. Having found this item, Barksdale told her that if she could provide him with "names of like dealers or whatever," he would not arrest her. Bradbury testified that she did not know any drug dealers, so Barksdale took her into custody.

During the State's cross-examination of Bradbury, she was asked about an incident which occurred in May 2020 when she spoke with law enforcement about Wilson assaulting her. The day after this incident, Bradbury telephoned police to recant her statement that Wilson had assaulted her, because she was concerned he would be arrested.

Ultimately, the jury convicted Bradbury of possession of a controlled substance and the district court subsequently sentenced her to 2 years of probation.

Bradbury appeals from her conviction here.

### III. ASSIGNMENTS OF ERROR

Bradbury assigns and argues that the district court erred in (1) overruling her motion to suppress statements she made to law enforcement prior to her arrest; (2) overruling her motion to suppress evidence obtained by law enforcement during a search of her bedroom; and (3) allowing the State to question her about a prior incident when she recanted a statement she had previously made to a law enforcement officer. In addition, Bradbury assigns and argues that there was not sufficient evidence for the jury to find her guilty beyond a reasonable doubt of possession of a controlled substance.

### IV. ANALYSIS

#### 1. MOTION TO SUPPRESS STATEMENTS

Bradbury first assigns that the district court erred in denying her motion to suppress the statements she made to Barksdale during his search of her apartment. She argues that she was in custody at the time of the search and was interrogated without the benefit of *Miranda* warnings, resulting in a violation of her constitutional rights. Upon our review, we affirm the decision of the district court to deny the motion to suppress statements.

#### (a) Standard of Review

In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *State v. Johnson*, 308 Neb. 331, 953 N.W.2d 772 (2021).

#### (b) Analysis

The Nebraska Supreme Court has recognized that *Miranda v. Arizona, supra*, prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination. *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020). More specifically, the court held:

> *Miranda* requires law enforcement to give a particular set of warnings to a person in custody before interrogation, including that he or she has the right to remain silent, that any statement he or she makes may be used as evidence against him or her, and that he or she has the right to an attorney. These warnings are considered prerequisites to the admissibility of any statement made by a defendant during custodial interrogation.
>
> *Miranda* warnings are required only when a suspect interrogated by the police is in custody. The ultimate inquiry for determining whether a person is in custody is whether there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest. Custody is to be determined based on how a reasonable person in the suspect's situation would perceive his or her circumstances. Stated another way, a seizure under the Fourth Amendment occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

In considering whether a suspect is in custody for *Miranda* purposes, relevant considerations include, but are not limited to the location of the interaction, who initiated the interaction, the duration of the interaction, the type and approach of questioning, the freedom of movement of the suspect, . . . and whether the suspect was placed under arrest at the termination of the interaction.

*State v. Benson*, 305 Neb. at 963-64, 943 N.W.2d at 439-40.

Bradbury argues that at the time of the search of her bedroom, she was in custody and was interrogated by Barksdale. He asked her whether she had anything illegal in the room and if so where would it be located. She further argues that her admission that everyone in the basement apartment used the glass pipe to smoke was the result of the custodial interrogation. Because such custodial interrogation was conducted without the safeguards of *Miranda*, Bradbury asserts that her statements should be suppressed. The district court denied her initial motion to suppress these statements and denied her renewed motion at trial. We find no error in the district court's determination that Bradbury was not in custody during the search of her bedroom.

The evidence presented at the suppression hearing and at trial revealed that, at the time of the search of her bedroom, Bradbury was not handcuffed, had not been placed under arrest, and had not been told that she was not free to leave. In fact, at the time of the search, Bradbury was voluntarily cooperating with Barksdale's investigation into Sipes. Barksdale made clear to Bradbury that the crux of his search of the basement apartment was locating any methamphetamine that Sipes may have left behind after his arrest. Barksdale specifically testified that when he asked and received Bradbury's consent to search her bedroom, his focus was still on Sipes, not on Bradbury. Given this evidence, a reasonable person would not have believed that they were in custody.

Bradbury points to her initial interaction with police on January 12, 2021, as evidence that she was in custody. Specifically, she references evidence that when she walked upstairs from the basement apartment, officers had their guns drawn and pointed in her direction. While this assertion is true, we also must take into account the remainder of Bradbury's interaction with the police. Barksdale clearly testified that officers drew their weapons and pointed them in the direction of the basement apartment during their attempt to arrest Sipes on his outstanding warrant. Given their knowledge of Sipes, the police utilized their weapons and ballistic shields as a safety precaution. Outside of Bradbury's initial exit from the basement, these tactics were not used in any subsequent interaction with her. The evidence presented at the suppression hearing and at trial indicated that prior to Bradbury pointing out the glass pipe in her bedroom, she was voluntarily cooperating with the police in their investigation of Sipes. There was nothing to suggest that Bradbury could not have ended her interaction with police at any time, that she could not have refused consent to search her bedroom, or that she was not free to leave the basement apartment. Bradbury was only taken into custody and informed she was not free to leave once Barksdale discovered the presence of a controlled substance in her bedroom.

Based upon the evidence presented and the totality of the circumstances, we conclude Bradbury was not subject to a custodial interrogation. Therefore, there was no Fifth Amendment violation of *Miranda*, and the district court did not err in denying the motion to suppress.

## 2. MOTION TO SUPPRESS EVIDENCE

In her brief on appeal, Bradbury also asserts that the district court erred in overruling her motion to suppress "all evidence seized from her home in violation of her rights." Brief for appellant at 27. In its brief to this court, the State argues that Bradbury waived her objection to the admission of this evidence because she did not renew her objection at trial. We agree with the State's assertion.

In her motion to suppress, Bradbury did assert that "the officers lacked probable cause to seize and hold" her in violation of her rights under the 4th and 14th Amendments to the constitution. However, no specific assertion was made that the evidence seized during the search of her bedroom should be suppressed because she did not voluntarily consent to that search. Therefore, it is unclear that the motion actually raised the issue of whether voluntary consent to the search was given. At the suppression hearing, counsel for Bradbury noted that the essential point they were addressing in their motion was that Bradbury was not read her *Miranda* rights before being asked to respond to Barksdale's inquiries. The district court overruled the motion to suppress in its entirety. The court gave a broad reading to the language of the motion and, among its other findings, determined that Bradbury did voluntarily consent to the search.

At trial, Bradbury did not object to the admission of the items seized from the bedroom, including the glass pipe stem or the baggie with methamphetamine residue. In fact, when the State offered these items into evidence, the district court asked defense counsel if there was any objection to receiving them. Defense counsel responded that there was no objection to either exhibit. At the sidebar conference where counsel for Bradbury renewed his objection based on the motion to suppress, counsel stated:

> Judge, I'm just going [to] renew my objection as to the motion to suppress previously. I just don't want to get into statements that I believe I tried suppressing based on the fact that she was in custody on the Fifth Amendment which was the allegation in the motion to suppress.

There was no mention of any objection based on a violation of Bradbury's lack of consent to the search, or any other violation of her Fourth Amendment rights.

Where there has been a pretrial ruling regarding the admissibility of evidence, a party must make a timely and specific objection to the evidence when it is offered at trial in order to preserve any error for appellate review. *State v. Lowman*, 308 Neb. 482, 954 N.W.2d 905 (2021). The failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal. *Id.* Here, the record clearly reveals that Bradbury did not renew any objection to the receipt of the items seized based on a nonconsensual search, nor did she object to the admission of the glass stem and baggie when they were offered into evidence at trial. As such, she has waived the objection, and we do not address further her arguments regarding the validity of the search.

### 3. "Recantation" Testimony

#### (a) Standard of Review

The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion. *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015).

#### (b) Additional Facts

During the State's cross-examination of Bradbury, the prosecutor questioned her about an occasion in May 2020 when she had spoken with law enforcement about an incident involving Wilson. Upon the State's questions, Bradbury testified that although she had not called police to report the incident, that after a witness summoned the police, Bradbury told them that Wilson had hit her while they were in a vehicle together. Bradbury also testified that the day after this incident, she again spoke with the police, but this time she denied that Wilson had hit her, claiming her previous report was inaccurate. Bradbury had indicated to the police that she did not want Wilson to be arrested.

Prior to the State's cross-examination of Bradbury on this topic, Bradbury's counsel objected, arguing that Bradbury's previous interactions with law enforcement in May 2020 were not relevant, that such evidence was more prejudicial than probative, and that it did not demonstrate Bradbury's character for untruthfulness. The district court overruled the objections, explaining:

> I think you can inquire into the domestic assault piece only with respect to the recantation. I think that . . . does go to truthfulness. . . . But where she is saying one thing one day, saying another thing another day, and then kind of trying to bargain with [law enforcement], I think that that comes in.

In her brief on appeal, Bradbury asserts that the district court erred in allowing the State to question her about the May 2020 incident. Specifically, she argues, "The district court abused its discretion in finding that [her] recantation in a domestic assault investigation was 'probative of truthfulness or untruthfulness' and in allowing the State to introduce such evidence during cross examination pursuant to Neb. Rev. Stat. § 27-608(2)." Brief for appellant at 30. Upon our review, we do not find the district court's decision to admit such testimony into evidence to be an abuse of discretion.

#### (c) Analysis

Neb. Evid. R. 608(2) provides as follows:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting his [or her] credibility, other than conviction of crime as provided in [Neb. Evid. R. 609], may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness be inquired into on cross-examination of the witness (a) concerning his [or her] character for truthfulness or untruthfulness, or (b) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The statute therefore commits to the court's discretion determinations of whether a line of cross-examination is allowed as being probative of truthfulness or untruthfulness. Regarding the May 2020 incident where Bradbury changed, or recanted, her statement to law enforcement that Wilson had assaulted her, we find it was reasonable and within the court's discretion to determine that this instance was probative of the truthfulness or untruthfulness of Bradbury's testimony in this case.

During her testimony regarding this incident, Bradbury admitted that, initially, she reported to law enforcement that Wilson had assaulted her. Subsequently, she recanted this statement, telling police that Wilson had, in fact, not assaulted her. According to Bradbury's testimony, such recantation was driven, in part, by Bradbury not wanting Wilson to be arrested and taken to jail. Such incident is relevant to Bradbury's truthfulness, as she either lied to law enforcement when she told them that Wilson had assaulted her, or she lied when she told them that he had not actually assaulted her. In fact, such incident is particularly relevant in this case, as the majority of Bradbury's testimony concerned her interactions with a law enforcement officer.

In her brief to this court, Bradbury questions whether the May 2020 incident could be probative of her truthfulness or untruthfulness when there was no evidence to explain the exact reasoning behind her recantation. However, Bradbury had the opportunity to provide any such reasoning to the district court and to the jury on redirect. However, counsel failed to ask any questions on redirect. We find no abuse of discretion in the district court's decision to allow the State to question Bradbury regarding the May 2020 incident.

### 4. SUFFICIENCY OF EVIDENCE

#### (a) Standard of Review

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Allen*, 314 Neb. 663, 992 N.W.2d 712 (2023).

#### (b) Analysis

In her brief on appeal, Bradbury asserts that the evidence presented at trial was insufficient to sustain her conviction for possession of a controlled substance. However, Bradbury does not specifically challenge the evidence as to any element of the charged offense, rather, she challenges only the credibility of Barksdale's testimony.

In determining the sufficiency of the evidence, we do not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence, as these matters are for the finder of fact. *Id*. Bradbury challenges the credibility of Barksdale's testimony because he could not remember every specific detail of his encounter with Bradbury in January 2021. However, given that the jury convicted Bradbury of possession of a controlled substance, it clearly found Barksdale's testimony to be credible and Bradbury's testimony to not be credible. We do not revisit this credibility determination on appeal.

- 10 -

Barksdale's testimony, which the jury clearly believed, established that a glass pipe stem and a baggie each containing methamphetamine residue were found in Bradbury's bedroom. Such testimony, coupled with Bradbury's admission that everyone in the basement apartment used the pipe to smoke, sufficiently demonstrates that Bradbury constructively possessed a controlled substance.

The Supreme Court has previously held that a person can be guilty of possession of a controlled substance even when the person does not have actual, physical possession of the substance, but instead has constructive possession of the substance. *State v. Warlick*, 308 Neb. 656, 956 N.W.2d 269 (2021). Constructive possession may be proved by mere ownership, dominion, or control over contraband itself, coupled with the intent to exercise control over the same. *Id*. Constructive possession may be proved by direct or circumstantial evidence and may be shown by the accused's proximity to the item at the time of the arrest or by a showing of dominion over it. *Id*. Thus, possession of a controlled substance means either (1) knowingly having it on one's person or (2) knowing of the substance's presence and having control over the substance. *Id*. Evidence that a defendant had constructive possession of a drug with knowledge of its presence and its character as a controlled substance is sufficient to support a finding of possession and to sustain a conviction for unlawful possession. *Id*.

Here, Barksdale testified that when he asked Bradbury where anything illegal in her bedroom was kept, she immediately brought Barksdale's attention to a box on her dresser. When she opened the box, Barksdale saw the glass pipe stem, previously used to smoke methamphetamine, inside. Such evidence demonstrates Bradbury's knowledge of the glass pipe, and thus, of the methamphetamine residue within. The pipe stem was found in Bradbury's bedroom, which indicates her control over it. Additionally, Bradbury admitted to Barksdale that everyone in the basement apartment, which would include herself, smoked using that glass pipe stem. This evidence, taken together, demonstrates Bradbury's constructive possession of a controlled substance. The evidence supports Bradbury's conviction.

## V. CONCLUSION

Having rejected each of Bradbury's assigned errors, we affirm her conviction for possession of a controlled substance.

AFFIRMED.